**2015-1965**

In The
# United States Court Of Appeals
## For The Federal Circuit

## AIP ACQUISITION LLC,

*Appellant,*

v.

## CISCO SYSTEMS, INC.

*Appellee.*

**ON APPEAL FROM THE PATENT AND TRADEMARK OFFICE,
PATENT TRIAL AND APPEAL BOARD
IN SERIAL NO. IPR2014-00247**

_____

**BRIEF OF APPELLANT**
_____

Chi Eng
ENG LAW FIRM
**Newark Gateway Center**
**One Gateway Center**
**Suite 2600**
**Newark, NJ 07102**
**(646) 770-2347**

*Counsel for Appellant*

# CERTIFICATE OF INTEREST

Pursuant to Federal Rule of Appellate Procedure 26.1 and Federal Circuit Rule 47.4, the undersigned counsel for Requester-Appellant AIP Acquisition LLC hereby certifies that:

1.     The full names of every party or amicus represented by me is:

AIP ACQUISITION LLC

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.     The parent companies, subsidiaries (except wholly-owned subsidiaries), and affiliates that have issued shares to the public, of the party or amicus represented by me are:

None.

4.     The names of all law firms and the partners and associates that appeared for any of the parties represented by me in the Patent and Trademark Office or are expected to appear in this Court are:

Alfred Froebrich of Lucas & Mercanti appeared before the Patent Trial Appeal Board in the Patent and Trademark Office below. John Philips, Robert DeVoto, and Dan Smith of Fish & Richardson also appeared in the proceeding before the Patent Trial Appeal Board but withdrew from the proceeding on December 23, 2014.

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...............................................................i

TABLE OF CONTENTS....................................................................... ii

TABLE OF AUTHORITIES ................................................................v

GLOSSARY ...................................................................................... vii

STATEMENT OF RELATED CASES ................................................ix

JURISDICTIONAL STATEMENT .....................................................1

STATEMENT OF THE ISSUES...........................................................2

STATEMENT OF THE CASE...............................................................3

      A.     Procedural History..............................................................3

      B.     The Board's Claim Construction of "internet protocol".......3

      C.     The Board's Final Written Decision .....................................4

      D.     Background and Statement of Facts.......................................6

              1.     Summary of the Invention ..........................................6

              2.     Priority Date of the '879 Patent .................................8

              3.     Expiration Date of the '879 Patent ............................8

              4.     ARPANET and "NSFnet/Internet": FCC – History of Internet – A Story of Common Standards and Protocols (Ex. 2011)....................................................8

              5.     Danny Cohen – ARPANET decommissioned (Ex. 2010)........11

              6.     Perry (Ex. 1019) – ARPANET ................................11

7.     Experimental RFC 1190 (ST2) Specification (Ex. 1011).........13

8.     Crowcroft (Ex. 1023) ................................................18

9.     Herrtwich and Delgrossi (Ex. 1030) .........................20

10.    Delgrossi (Ex. 1028 and 1034) ................................22

11.    Weinstein-Forgie: Prior Art Experimental Packet Speech Communication Network Using IP for Control and ST Protocol for Speech Transport .................................27

E.     The Level of Ordinary Skill in the Art ...............................31

SUMMARY OF THE ARGUMENT .......................................................32

Obviousness .................................................................................32

ARGUMENT ......................................................................................34

A.     Standard of Review ...........................................................34

B.     The Board Incorrectly Concluded that the Defunct Weinstein-Forgie System and the Incomplete and Incompatible Experimental RFC 1190 Specification Rendered the Claimed Invention Obvious ...............................................................35

1.     The Board's Conclusion of Obviousness Is Unsupported By Substantial Evidence ...........................................38

2.     The Board Erred In Its Conclusion of Obviousness Because It Misunderstood the Meaning of "Implementation" of Experimental RFC 1190 Specification...........................................................41

3.     The Defunct Weinstein-Forgie System and the Incomplete and Incompatible RFC 1190 Specification Are So Flawed That An Ordinary Artisan Would Not Be Motivated to Combine Them .....................................47

4.     No Substantial Evidence that Defunct Weinstein-Forgie Can Be Combined with Experimental RFC 1190 Specification with Reasonable Expectation of Success............54

5.     The Board Erred In Its Analysis of Objective Considerations............................................................................60

6.     The Board Engaged In Hindsight Reconstruction of the Claimed Invention.....................................................................64

CONCLUSION ......................................................................................67

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexsam, Inc. v. IDT Corp.*,
   715 F.3d 1336 (Fed. Cir. 2013) ........................................................ 45, 52, 54

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
   419 U.S. 281, 95 S.Ct. 438 L. Ed. 2d 447 (1974) .................................. 34, 35

*Centricut, LLC v. Esab Group, Inc.*,
   390 F.3d 1361 (Fed.Cir. 2004) ................................................................ 45-46

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197, 59 S. Ct. 206, 83 L. Ed. 126 (1938) .........................................34

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607, 86 S. Ct. 1018, 16 L. Ed. d 131 (1966) ...................................34

*Graham v. John Deere Co. of Kan. City*,
   383 U.S. 1, 86 S. Ct. 684, 15 L. Ed. 2d 545 (1966) ................................ 34, 64

*In re Applied Materials, Inc.*,
   692 F.3d 1289 (Fed. Cir. 2012) .....................................................................34

*In re Cyclobenzaprine Hydrocholoride*,
   676 F.3d 1063 (Fed. Cir. 2012) .......................................................... *passim*

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000) .....................................................................34

*In re Huston*,
   308 F.3d 1267 (Fed.Cir.2002) .......................................................................35

*In re Lee*,
   277 F.3d 1338 (Fed. Cir.2002) ......................................................................34

*Innogenetics, N.V. v. Abbott Labs*,
   512 F.3d 1364 (Fed. Cir. 2008) .....................................................................46

v

*Insite Vision, Inc. v. Sandoz, Inc.*,
    783 F.3d 853 (Fed. Cir. 2015) ............................................................ 35, 65

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
    688 F.3d 1342 (Fed. Cir. 2012) .......................................................... 54, 66

*KSR Int'l v. Teleflex*,
    127 S. Ct. 1727 (2007).................................................................. 53, 57, 58

*Para-Ordnance Mfg., Inc. v. SGS Imps. Int'l, Inc.*,
    73 F.3d 1085 (Fed. Cir. 1995) ........................................................... 34, 35

*Sec. & Exch. Comm'n v. Chenery Corp.*,
    332 U.S. 194, 67 S. Ct. 1575, 91 L. Ed. 1995 (1947) ................................34

*Wyers v. Master Lock Co.*,
    616 F.3d 1231 (Fed. Cir. 2010) .................................................................45

**Statutes**

35 U.S.C. §§ 311 – 319.............................................................................3

**Rules**

37 C.F.R. §42.123 ............................................................................ 39, 40

## GLOSSARY

| GENERAL | | |
|---|---|---|
| | Board | Patent Trial and Appeal Board of the Patent and Trademark Office |
| Appx1-24 | Final Decision | Final Written Decision issued by the Board in the case below *Inter Partes* Review IPR2014-00247 on May 20, 2015 |
| Appx25-42 | '879 Patent (Patent-in-suit) | U.S. Patent No. 7,724,879, Entitled "Efficient Communication Through Networks," Filed on August 24, 2007, and Issued on May 25, 2010 |
| **REFERENCES** | | |
| Appx2103 | ARPANET | The ARPANET was initiated in 1969 by the Advanced Research Projects Agency (DARPA) of the Department of Defense. "Small minicomputers called Interface Message Processors (IMPs), linked by 50Kbit/second wideband leased telephone lines, were used to interconnect a wide variety of dissimilar host computer systems to form a robust, reliable, highly survivable network …. one of the key contributions of the ARPANET research project was the development of interoperable, computer-to-computer data communication protocols." |
| Appx2168 | Crowcroft (Ex. 1023) | J. Crowcroft, et al., "Multimedia TeleConferencing over International Packet Switched Networks," PROCEEDINGS OF TRICOMM'91, IEEE CONFERENCE ON COMMUNICATIONS SOFTWARE (1991). |

| Appx2294-95; Appx2602-11, Appx2621-22 | Delgrossi (Ex. 1028 or Ex. 1034) | L. Delgrossi, "Implementing the ST-II Protocol," Ch. 4 of DESIGN OF RESERVATIONPROTOCOLS FOR MULTIMEDIA COMMUNICATION (Kluwer 1996) (Ex. 1028 with front matter). |
|---|---|---|
| Appx 1628, Appx1634-36, Appx1758-60 | Experimental RFC 1190 Specification | RFC 1190, "Experimental Internet Stream Protocol, Version 2 (ST-II)" (Oct. 1990) ("Experimental RFC1190"). |
| Appx2470-71 | Herrtwich (Ex. 1030) | Herrtwich et al., "Beyond ST-II: Fulfilling the Requirements of Multimedia Communication," Proceedings of the Third International Workshop on Network and Operating System Support for Digital Audio and Video, La Jolla, California (Nov. 1992). |
| Appx1884; Appx1890-92 | Internet Protocol | RFC 791, Internet Protocol, DARPA Internet Program, Protocol Specification (Sept. 1981) ("RFC791") |
| Appx2802 | NSFNet | NSFNet was a network of civilian computers connected by a backbone built by the National Science Foundation (NSF) since 1987, which in time became the Internet. |
| Appx1610 | Weinstein-Forgie | Clifford J. Weinstein and James W. Forgie, "Experience with speech communication in packet networks," IEEE Journal on Selected Areas in Communications, Special Issue on Packet Switched Voice and Data Communications, Vol. 1, No. 6, December 1983, pp. 963-980. |

## STATEMENT OF RELATED CASES

No appeal in or from this proceeding was previously before this or any other appellate court.

Case No. 15-1286 currently pending before this Court relates to the same patent-in-suit, US Patent No. 7,724,879.

## JURISDICTIONAL STATEMENT

The United States Patent & Trademark Office Patent Trial and Appeal Board ("the Board") had jurisdiction under 35 U.S.C. § 134. The Board mailed its Final Decision on May 20, 2015 (A0001-A0023). Patent Owner AIP Acquisition LLC ("AIP") filed a Notice of Appeal on July 17, 2015 in accordance with 37 C.F.R. §90.2(a). The appeal was docketed on September 1, 2015. The Notice of Appeal was timely filed pursuant to 35 U.S.C. § 142. This Court has jurisdiction under 35 U.S.C. § 141 and 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

I.      Whether the Board's conclusion of obviousness rested on a misapprehension of "implementation" of Experimental RFC 1190 specification.

II.     Whether there is substantial evidence supporting the Board's conclusion that an ordinary artisan would be motivated to combine the defunct Weinstein-Forgie system with the incomplete and incompatible Experimental RFC 1190 specification to produce the claimed invention.

III.    Whether the Board erred in its determination that an ordinary artisan could combine the defunct experimental Weinstein-Forgie system with the incomplete and incompatible Experimental RFC 1190 specification to produce the claimed invention with a reasonable expectation of success.

IV.     Whether the Board erred in its evaluation of objective considerations.

V.      Whether the Board's obviousness conclusion rested on impermissible hindsight reconstruction of the claimed invention.

## STATEMENT OF THE CASE

### A.    Procedural History

Cisco Systems, Inc. ("Petitioner" or "Cisco") filed a Petition (Appx106, "Pet.") on Dec. 12, 2013 requesting *inter partes* review of claims 1–15 (all the claims) of U.S. Patent No. 7,724,879 B2 ("the '879 patent") under 35 U.S.C. §§ 311 – 319. Patent Owner filed a Preliminary Response on March 19, 2104.  Appx127-29 and 170.  On May 27, 2014, the Board instituted an *inter partes* review of claims 1-8, 12, 14 and 15 ("the challenged claims") on two asserted grounds of unpatentability (Appx171, Appx204, "Decision on Institution"). Subsequent to institution, AIP Acquisition LLC ("Patent Owner") filed a Patent Owner Response on Aug. 18, 2014. (Appx231-33 and 263, "PO Resp.")  Petitioner filed its Reply to the Patent Owner Response on Nov. 14, 2014.  (Appx296, "Pet. Reply")  Oral hearing was held on February 9, 2015.  (Appx311-314, "Oral Hearing Notice")  The Board, in its Final Decision entered on May 20, 2015, ordered claims 1-8, 12, 14, and 15 of the '879 Patent unpatentable. (Appx1-24, "Final Decision").

### B.    The Board's Claim Construction of "internet protocol"

The Board construed the term "internet protocol" in its Final Decision, "as a specific set of rules, procedures, or conventions relating to the format and timing of data transmissions between two devices on different networks." Since the '879 patent states that the Internet differs from frame relay switching and ATM in that

the Internet uses internet protocols, such as TCP/IP, "the protocols used within

ATM and frame relay switching networks are not internet protocols." Appx12

(Final Decision).

### C.    The Board's Final Written Decision

The Board stated Cisco "has submitted evidence of the **implementation** of

ST-II in various systems near the time of invention of the '879 patent.  Ex. 1023, 1-

4, Ex. 1030, 4-6, and Ex. 1034, 20-21."  (emphasis added.) Appx 18, Final

Decision, p. 18.  The Board further stated that "the submitted evidence regarding

other internet engineers implementing systems **adopting** ST-II supports a

conclusion that a skilled artisan would have been capable of making the necessary

correlated changes to hardware in order to implement ST-II."  (emphasis added.)

Appx19, Final Decision, p. 19.  Ex. 1023, Ex. 1030, and Ex. 1034 referred to by

the Board are research publications disclosing ST-II, which will be discussed in

detail in Sections D.8-D.10 below.

Prior to its discussion of the objective considerations in the evidentiary record,

the Board concluded that "an ordinary skilled artisan would have found it obvious to

consider upgrading ST to ST-II, the version available at the time of invention of the

'879 patent."  Appx19, Final Decision, p. 19.  The Board did not cite any evidence

in direct support of this conclusion.  Although ARPANET was decommissioned

several years prior to the time of the invention of the '879 patent, the Board

concluded that "[o]ne would not have need to 'resurrect' the defunct ARPANET to take advantage of Weinstein's teachings regarding combining voice networks with data networks. Rather one would have gleaned the knowledge necessary to create a system using a data network to transport voice communication as a bridge between conventional telephony networks." Appx19, Final Decision, p. 19. The Board also did not cite any documentary evidence or expert testimony in support of this conclusion. The Board apparently relied on Cisco's bald assertion that "the shutdown of ARPANET neither erased the knowledge and teachings conveyed by Weinstein nor led to shutting down the entirety of Weinstein's disclosed system" and that "a skilled artisan would have been capable of the making the hardware upgrades necessary when migrating from ST to ST-II." *Id.*

Notably, the Board did not make any finding or cite any evidence such as an expert's testimony showing an ordinary artisan's understanding of any of the "implementations" of ST-II in the various systems disclosed by Crowcroft, Herrtwich or Delgrossi cited by the Board. The term "implementation" of a software specification such as RFC 1190 in the field of computer science typically means the writing of software based on a specification during a testing phase of a software development. Thus, there is no evidentiary support for the term "implementation" to mean "adoption" or deployment of a software specification in a commercial or production system as implied by the Board.

Furthermore, the Board did not make any evidentiary finding in support of its conclusion that an ordinary artisan, who is skilled in software programming, would be able to make the "necessary correlated changes to hardware" to produce the claimed invention.  Neither did the Board explain the scientific principles or general knowledge upon which the ordinary artisan could rely on to make the requisite modifications to the Weinstein-Forgie system to produce the claimed invention.

In fact, the submitted evidence relied on by the Board for its obviousness determination consists of the researchers' discussions of their ST-II "implementations" and, on its face, does not teach an ordinary artisan to modify the defunct Weinstein-Forgie system to use an incomplete and incompatible ST-II protocol.

**D.**    **Background and Statement of Facts**

**1.**    **Summary of the Invention**

The patentee summarized the invention in the file history as follows:

"As set forth in the Field of the Invention and Summary of the Invention of the present application, the present invention relates to a system for providing transparent access to different types of communication networks that may be incompatible with each other and some of which may be incompatible with the equipment used by the calling party or the called party, least cost routing in such a system, maintaining quality of communication in such a system, prioritizing the routing of such communications, evaluating different communication access locations to determine

where to send a communication, synchronizing communications, blocking incoming

communications while waiting for the synchronizing to be completed, and

minimizing the cost of communications using such a system (see paragraph [0002] of

the present application as published in U.S. Patent Application Publication No.

2005/0111647) ['879 Patent, 1:19-30]. In accordance with the invention, control

information in the form of an inquiry of the availability status of the party to be called

may be sent through different networks by routing it through a control location of the

inventive system that converts it into a compatible form (paragraph [0006] in the

publication of the present application) ['879 patent, 2:4-12]. The inventive system

may have external or internal software and hardware that intercept the normal

transmission to route it appropriately. The system effects further routing, which may

include converting between different forms of communication networks, compressing

voice into data packets or decompressing data packets into voice, coding and

decoding transmission for security reasons, and multiplexing communications over

the same lines (paragraph [0008] in the publication of the present application) ['879

patent, 2:22-31]. Advantageously, one embodiment of the present invention allows

the Internet or other data network to function like a telephone system (paragraph

[0041] in the publication of the present application)['879 patent, 6:36-38]. In that

specific embodiment of the present application, callers are allowed to dial anywhere

in the world for the price of a local access and service fee, thereby avoiding the use of

long distance carriers and thus the usage charges typically associated with long distance calls (paragraph [0041] in the publication of the present application) ['879 patent, 6:38-40]." Appx1229-30, Ex. 1006, Amendment filed in continuation application No. 10/941,471.

### 2. Priority Date of the '879 Patent

The '879 patent issued from a chain of applications.  It claims the benefit of several earlier filed applications including Israeli patent application IL 115580, filed on October 11, 1995, which includes at least the same Fig. 8 as that in the '879 patent.  Appx1460, Appx1500.  For example, 7:22-56 of the '879 patent corresponds to p. 12, line 19 – p. 13, line 16 of IL115580. Appx1473-74.  For another example, 13:17-14:26 of '879 patent correspond to p. 23, line 19 – p. 25, line 23 of IL115580.  Appx1484-86.  The earliest filed patent application in the chain is Application No. 08/320,269, filed on October 11, 1994.

### 3. Expiration Date of the '879 Patent

The '879 patent expired on October 11, 2014.  Appx222.

### 4. ARPANET and "NSFnet/Internet": FCC – History of Internet – A Story of Common Standards and Protocols (Ex. 2011)

"In 1969, when the ARPANET eventually connected computers at Stanford, UCLA, UC-Santa Barbara, and the University of Utah, it was a significant step toward realizing the vision of the computer as an extender of human capabilities.

But, four connected computers did not constitute a 'galactic' network.  How ARPANET created the foundation upon which today's true 'galactic' network, the Internet, is built is a story about using common standards and protocols to implement vision."  Appx2799, Ex. 2011 at 1.

"One historian of the Internet says, 'In the beginning was - chaos.' And so it often is when people are trying something so new that many can't even find words to describe it. But, while chaos can bring great energy and excitement, differing techniques, media, and protocols have to give way to common approaches if a build-up of chaotic energy is to result in something other than an explosion."  *Id*.

"Because of the increasing complexity the Internet's TCP/IP protocols represented when compared to ARPANET's NCP protocol – simply put, the difference between creating one national network versus linking multiple, world-wide networks – several additional methods and organizations were established in the 1980s and 1990s to deal with protocol and standards. First among these was the 1986 establishment of the Internet Engineering Task Force (IETF). The IETF took over responsibility for short-to- medium term Internet engineering issues, which had previously been handled by the Internet Activities Board. The Internet Society (ISOC), begun in 1992, provides an organizational home for the IETF and the Internet Architecture Board (IAB) (previously IAB stood for the Internet Activities Board)."  Appx2800-01, Ex. 2011 at 2-3.

9

Importantly, "[t]hese, and other, organizations employ a variety of working groups, task forces, and committees to work through a **multi-stage process** of suggesting, reviewing, accepting, and issuing standards for the Internet. **When a specification reaches the point that it 'is characterized by a high degree of technical maturity and by a generally held belief that the specified protocol or service provides significant benefit to the Internet community' it is released as an Internet Standard**. Today there are 63 Internet Standards." (emphasis added) Appx2801, Ex. 2011 at 3.

"By making common standards a routine practice from the beginning, ARPANET began pouring a strong foundation.  In fact, ARPANET was so dedicated to common standards that RFC 1 was issued on April 7, 1969, six months before the first network connection was made. By 1982, when ARPANET transitioned to the use of the TCP/IP inter-networking protocols, the foundational footings had fully settled and the way was open for broader public involvement." *Id*.

"By the time ARPANET was formally decommissioned in 1990, the NSFnet/Internet was poised for explosive growth. When the NSF lifted all restrictions on commercial use of its network backbone in 1991, today's Internet was begun." Appx2802, Ex. 2011 at 4.

Thus, according to FCC, it was the NSFnet that became today's Internet, not ARPANET.

### 5. Danny Cohen – ARPANET decommissioned (Ex. 2010)

According to Internet engineer Danny Cohen, ARPANET was decommissioned at midnight on Wednesday, February 28, 1990, and its IP address, 10, was retired. "As of March 1st, 1990, no more brain activity can be detected on the ARPAnet, even though some small parts of her body are still artificially keft [sic] alive." Appx2797, Ex. 2010 at 1.

### 6. Perry (Ex. 1019) – ARPANET

The Perry reference (Ex. 1019), entitled "The ARPANET and the DARPA Internet," describes the development of ARPANET and the DARPA Internet. Appx2103.

According to Perry, ARPANET comprises "[s]mall minicomputers called Interface Message Processors (IMPs), linked by 50 Kbit/second wideband leased telephone lines, [which] were used to interconnect a wide variety of dissimilar host computer systems to form a robust, reliable, highly survivable network. Besides serving as a model for all future packet switching networks, one of the key contributions of the ARPANET research project was the development of **interoperable**, computer-to-computer data communication protocols." (emphasis added.) *Id*. "As different types of packet-switching networks were being developed, and in response to a requirement to interconnect these networks, the DARPA Internet was formed in the 1970s. DARPA sponsored the development of

Internet Gateways to forward packets and connect the dissimilar networks.  The

architecture that permits this interconnection of networks is defined by the

protocols adopted as DoD standards, the Transmission Control Protocol (TCP) and

the Internet Protocol."  Appx2108, Ex. 1019 at 6.

According to Cisco expert, Dr. Houh, ARPANET was the hub of the

Internet, and "[t]he figure below shows some of the networks that constituted the

Internet in the late 1970's. Among the prominent networks included in the Internet

of that era were the ARPANET and the Wideband Satellite Network."  Appx1514-

15, Ex. 1008, Houh Decl., ¶26; Appx2109, Ex. 1019, p. 7.



Figure 5:   Original DARPA Internet Configuration of the late 1970's

ISSUE 22    57

12

### 7.     Experimental RFC 1190 (ST2) Specification (Ex. 1011)

RFC 1190 specification, entitled "Experimental Internet Stream Protocol, Version 2 (ST-II)," is published by the CIP Working Group and designated as "Experimental" by the Internet Engineering Task Force ("IETF").  Appx1628, Ex. 1011 at 1.  ST-II is "a Limited-Use Experimental Protocol" which was proposed "as an internet protocol at the same layer as IP" for the Internet. Appx1628, Appx1634.  Notably, Experimental ST-II is not designated as an "Internet Standard," i.e. not adopted by the IETF for the Internet.  "The motivation for the original [version 1 of the] protocol was that IP did not provide the delay and data rate characteristics necessary to support voice applications." Appx1634.

Experimental RFC1190 specification indicates that ST-II implementations (i.e. software written based on the specification) can be subsetted and need not be fully implemented.  However, for interoperability, such ST-II implementations must be "similarly subsetted."

```
This memo also defines "subsets" of ST that can be implemented.  A
subsetted implementation does not have full ST functionality, but
it can interoperate with other similarly subsetted
implementations, or with a full implementation, in a predictable
and consistent manner.  This approach allows an implementation to
be built and provide service with minimum effort, and gives it an
immediate and well defined growth path.
```

Appx1636, Ex. 1011 at 9.

13

Experimental RFC 1190 specification was published in October 1990, after ARPANET was decommissioned in February 1990. There is reasonable ground to believe that Experimental RFC 1190 specification was not intended for the already decommissioned ARPANET.

Experimental RFC 1190 specification explains that IP does not require routers to maintain state information describing the streams of packets flowing through them. In contrast, the ST protocol requires every intervening ST entity/agent (e.g. routers) to maintain state information for each stream that passes through it. "This pre-allocation of resources allows data packets to be forwarded with low delay, low overhead, and a low probability of loss due to congestion." Appx1634, Ex. 1011 at 7.

"An internet entity that implements the ST Protocol is called an ST Agent." Appx1636, Ex. 1011 at 9. ST-II is further characterized as follows.

```
ST provides applications with an end-to-end flow oriented service
across an internet.  This service is implemented using objects
called "streams".  ST data packets are not considered to be
totally independent as are IP data packets.  They are transmitted
only as part of a point-to-point or point-to-multi- point stream.
ST creates a stream during a setup phase before data is
transmitted.  During the setup phase, routes are selected and
internetwork resources are reserved.  Except for explicit changes
to the stream, the routes remain in effect until the stream is
explicitly torn down.
```

*Id.*

Fig. 1 illustrates the protocol relationship of ST-II, IP, and the Application, Transport, and Internet (i.e. network) layers:



Figure 1. Protocol Relationships

Appx1633, Ex. 1011, p. 6.

Experimental RFC 1190 points out that ST-II is not compatible with Version 1 of the protocol.  Appx1, Ex. 1011 at 1. The major differences between ST-II and the original ST protocol are as follows:

2.1.        Major Differences Between ST and ST-II

ST-II supports a wider variety of applications than did the
original ST.  The differences between ST and ST-II are fairly
straight forward yet provide great improvements.  Four of the more
notable differences are:

1   ST-II is decoupled from the Access Controller (AC).  The
    AC, as well as providing a rudimentary access control
    function, also served as a centralized repository and
    distributor of the conference information.  If an AC is
    necessary, it should be an entity in a higher layer
    protocol.  A large variety of applications such as
    conferencing, distributed simulations, and wargaming can
    be run without an explicit AC.

2   The basic stream construct of ST-II is a directed tree
    carrying traffic away from a source to all the
    destinations, rather than the original ST's omniplex
    structure.  For example, a conference is composed of a
    number of such trees, one for traffic from each
    participant.  Although there are more (simplex) streams in
    ST-II, each is much simpler to manage, so the aggregate is
    much simpler.  This change has a minimal impact on the
    application.

3   ST-II defines a number of the robustness and recovery
    mechanisms that were left undefined in the original ST
    specification.  In case of a network or ST Agent failure,
    a stream may optionally be repaired automatically (i.e.,
    without intervention from the user or the application)
    using a pruned depth first search starting at the ST Agent
    immediately preceding the failure.

4   ST-II does not make an inherent distinction between
    streams connecting only two communicants and streams among
    an arbitrary number of communicants.

Appx1635, Ex. 1011 at 8.

Notably, Experimental RFC 1190 specification (Sec. 5 "Areas Not
Addressed") discloses that the specification is incomplete.  Some issues are
network or implementation specific but in other cases, "appropriate solutions are
not clear at this time."  Appx1758, Ex. 1011 at 131.

```
There are a number of issues that will need to be addressed in the
long run but are not addressed here.  Some issues are network or
implementation specific.  For example, the management of multicast
groups depends on the interface that a network provides to the ST
agent, and an UP/DOWN protocol based on ST HELLO messages depends on
the details of the ST agents.  Both these examples may impact the ST
implementations, but we feel it is inappropriate to specify them
here.
```

*Id*.

For example, the specification does not include "a routing mechanism" and the authors of the specification believe that "further research and experimentation will be required before an appropriate routing strategy is well enough defined to be incorporated into the ST specification." *Id.* There is also the problem of designing a mechanism for transmitting a stream by the ST agents after the "bandwidth for a stream is agreed upon" because "it is not sufficient to rely on the origin to transmit the stream at that rate."  The author of the specification believes "[e]xperimentation is necessary before such a mechanism is selected."  For another example, the specification discloses that "[t]the interface between the [ST] agent and the network is very limited. A mechanism is provided by which the ST layer can query the network to determine the likelihood that a stream can be supported. However, this facility will require practical experience before its appropriate use is defined." *Id.*  For yet another example, "[a] mechanism is also not defined for cases where a stream cannot be completed not because of lack of resources but because of an unexpected failure that results in ERROR-IN-REQUEST message.

An ERROR-IN-REQUEST message is returned in cases when an ST agent issues a malformed control message to a neighbor.  Such an occurrence is unexpected and may be caused by a bad or incomplete ST implementation."  Appx1759, Ex. 1011 at 132.

The authors of the RFC 1190 specification conclude that the proposed ST-II protocol is intended for further research on "stream oriented services across packet switched networks":

```
We hope that the ST we here propose will act as a vehicle to study
the use and performance of stream oriented services across packet
switched networks.
```

Appx1760, Ex. 1011, at 133.

Internet researchers responded by implementing Experimental RFC 1190 specification and testing their ST-II implementations as disclosed by Ex. 1030 ("Herrtwich") and Ex. 1034 ("Delgrossi").

### 8.     Crowcroft (Ex. 1023)

Ex. 1023 ("Crowcroft") is a technical paper authored by Dr. Crowcroft et al. and published in 1991.  Crowcroft discloses a "Multimedia Teleconferencing system over International Packet Switched Networks" at the University of College London ("UCL") in UK.  Appx2168, Ex. 1023 at 1. Crowcroft further discloses a "UCL Butterfly ST/IP gateway" which runs the original ST protocol for video and voice and IP protocol for "ordinary data traffic." Appx2169, Ex. 1023, p. 2.

18

According to Crowcroft:

> ST is a variant of the Internet Datagram Protocol (IP). The main difference is that it provides resource reservation facilities for PVP and VT to declare requirements in advance. A control message is sent using the Stream Control Message Protocol to setup paths through the network from the source of a conference site to all the destinations ("Multicast"). This message carries a "FlowSpec" to all the ST/IP gateways which says what the delay/bandwidth/error requirements of the requester are.[3]
>
> The gateway also runs (at the same level) IP to carry ordinary data traffic from workstations running the TCP/IP protocols.

*Id*.

Crowcroft contemplates or envisages a possible future application of the revised version of ST protocol, i.e. ST-II:

> It is envisaged that ST-II will soon be available on workstations (under Unix, in the kernel), and also that it will run over the IP protocol, and this can run over an un-modified Internet system (rather than the dual ST/IP ICB/TWB networks). The configuration would then collapse the packetizing, routing, audio output and input and video display functionality into a single workstation component. This would be highly suitable for "head and shoulders" participation.

Appx2171, Ex. 1023, p. 4.

Notably, Crowcroft does not disclose any "implementation" of Experimental RFC 1190 specification.

### 9.    Herrtwich and Delgrossi (Ex. 1030)

Ex. 1030 ("Herrtwich") is a technical paper authored by Herrtwich and Delgrossi and published in 1992 at the Third International Workshop on Network and Operating System Support for Digitial Audio and Video.  Appx2467-68. Cisco submitted this reference, without any direct expert testimony, when it filed its Reply to the Patent Owner Response.

Herrtwich discloses the Heidelberg Transport System (HeiTS) "uses the Internet ST-II protocol as its communication core."  Appx2470, Ex. 1030 at 4. Herrtwich distinguishes its user-level "implementation" of ST-II from those of other ST-II researchers:

> The core of HeiTS is the Experimental Internet Stream Protocol, Version 2 – ST-II for short [3]. There exist several implementations of the protocol worldwide. The most prominent code (because it is available in the public domain) comes from BBN and runs on SUN workstations. We did not base our implementation [4] on this or any other existing code because we wanted to have a user-level implementation of the protocol (to make it easier to port the protocol to non-UNIX systems and to integrate it with microkernel operating systems – still keeping the option to migrate the protocol code into the kernel). For the port to OS/2 this decision was crucial. We found the performance impact of this decision perfectly acceptable [4].

Appx2470, Ex. 1030 at 4.

Importantly, Herrtwich discloses that the feasibility of HeiTS for sample multimedia application was still being examined:

> We are still in the process of examining the feasibility of HeiTS for sample multimedia applications – and there is no end in sight as new applications are continuously added. This paper summarizes our findings so far. Section 2 describes the functions provided by ST-II and briefly evaluates how essential they are for multimedia communication. Section 3 determines some useful additions to the ST-II functions within the network layer. Section 4 examines what kind of transport functions are required on top of ST-II.

Appx2471, Ex. 1030 at 5.

In other words, even though ST-II was implemented in the HeiTS platform, the Internet researchers could not determine whether HeiTS and ST-II could be used for multimedia applications. Apparently, the testing of HeiTS and ST-II was incomplete or unsuccessful at the time of its publication in 1992.

Herrtwich concludes that although "ST-II (possibly extended)" and HeiTP provide a basis for multimedia data exchange, additional software development was needed for multimedia applications:

> **5  Closing Remark**
>
> ST-II (possibly extended) and HeiTP provide a good basis for multimedia data exchange. Yet, distributed multimedia applications require communication support beyond mere data transport. To facilitate the control of different multimedia data streams passing through a network, we are developing HeiMAT, the Heidelberg Multimedia Application Toolkit. HeiMAT takes care of the joint setup of connections for multimedia applications such as video conferences.

Appx2475, Ex. 1030 at 9.

Thus, as shown by Herrtwich, implementation of ST-II does not mean the implementation would work for the intended purpose or otherwise be "useful" to the researchers, let alone "adopted" by the researchers. An ST-II implementation

is a vehicle for the Internet researcher to conduct experimentation on the Experimental RFC 1190 specification (as the authors of RFC1190 intended).

Cisco's own expert, Dr. Houh, did not consider or opine on any portion of the Herrtwich reference because it was submitted with Cisco's Reply.

### 10.    Delgrossi (Ex. 1028 and 1034)

Ex. 1034 is an excerpt of a book written by Dr. Delgrossi entitled "The Design of Reservation Protocols for Multimedia Communication" published in 1996 ("Delgrossi"), consisting of the Preface, Foreword, and Chapter 4 of the book.  Ex. 1028 is a copy of Chapter 4 of Delgrossi that was introduced by Cisco for the first time during Cisco's cross examination of AIP's expert, Dr. Weinstein, on the issue of whether experimental ST-II is a "conventional" protocol for the Internet.  Appx2294, Ex. 1028 at 1; Appx2602-11; Ex. 1034 at 1-10; Appx2418-20, Ex. 1029, 107:25-108:2; Appx2872-73, Appx2898, Ex. 2018.  Cisco's own expert, Dr. Houh, did not consider or opine on any portion of the Delgrossi reference because it was submitted with Cisco's Reply.

Notably, the publication date of Delgrossi is after October 11, 1995, the priority date of the earlier filed Israeli Patent IL1155880.  Appx2294, Ex. 1028 at 1; Appx2604, Appx2621, Ex. 1034 at 3 and 20.  Thus, Delgrossi is not prior art to the '879 patent at least with respect to the filing date of Israeli Patent IL55880.

Dr. Delgrossi was a member of the Heidelberg Transport System ("HeiTS") group at the IBM European Networking Center in Heidelberg, Germany. Appx2617, Ex. 1034 at 16. "HeiTS is a multimedia transport system that facilitates the exchange of streams with real-time guarantees over internetworks." Appx2622, Ex. 1034 at 21. "The HeiTS architecture is based on using the Internet Stream Protocol Version 2 (ST-II) at the network layer. The Heidelberg researchers were among the first to implement ST-II, and their implementation was **one of the most complete ones**." (emphasis added.) Appx2617, Ex. 1034 at 16.

"Since its design in 1990 ST-II has been implemented by several vendors and research institutes, and versions of the protocol exist that run on the most widespread platforms, operating systems, and subnetworks. Recently, a survey by Chip Elliott [EILy93] listed at least 13 existing ST-II implementations. The four main implementations, operational today, are totally separate and they are based on very different platforms." Appx2621, Ex. 1034 at 20.

"The ENC ST-II runs on IBM RS/6000 machines with the AIX 3.2 operating system and has been ported to PS/2 computers with OS/2 2.1. Recently, a DOS Windows version for PCs has also been completed. The implementation, in contrast to others, runs in user space. This has been motivated by the need to port the protocol to non-Unix systems, even though it would impose limits on achievable performance. To leave open the possibility to migrate the current ST-II

23

code into the Unix kernel, C has been adopted as the programming language. The **implementation consists of about 18.000 lines of code** and has been developed by Frank Hoffman, Sibylle Schaller, and myself." (emphasis added) Appx2622, Ex. 1034 at 21.

Note that Dr. Delgrossi refers to his "implementation" as consisting 18,000 lines of code and "developed by" the named researchers, i.e. not "adopted" or "deployed" by the researchers as implied by the Board and Cisco. Delgrossi's usage of the term "implementation" is consistent with the customary meaning of the term, i.e. the writing of software based on a software specification.

Figure 19 illustrates the different modules of the implementation. Appx2622-23, Ex. 1034 at 21-22.



Figure 19: The ST-II Engine – Modularity

In Section 4.4 "Performance Evaluation of the ENC ST -II Implementation," Delgrossi reported "the first results from a performance evaluation of the ENC ST-II implementation." According to Delgrossi, "[t]he results presented here are only a first step towards a full evaluation of the protocol efficiency. Since the current **implementation** needs to be tuned and optimized, the main goal of this activity has been to analyze the internal behavior of the network software to identify which operations are most demanding in terms of processing time and whether they can be improved." (emphasis added.) Appx2633, Ex. 1034 at 32. "The main purpose of the ST-II measurements was to find out whether the upcall mechanism that has been used is efficient and what the advantages and drawbacks of using the ENC buffer management subsystem are. The first measurements focus on the data transfer phase, which is the most critical and where the benefits from the resource reservation technique are reflected." Appx2633-34, Ex. 1034 at 32-33.

Delgrossi also discloses that a "[p]rerequisite for using the bandwidth allocation support mechanisms of ST-II is a resource management method .... The ST-II protocol specification proposes a generic interface to the local resource manager, but it does not explain in detail how resource reservation needs to be done." Appx2630, Ex. 1034 at 29. In other words, Delgrossi found another deficiency with Experimental RFC 1190.

25

Delgrossi concludes that "[t]he upcall mechanisms are efficiently **implemented**: to pass the packet to the upper layer, process the packet and return, takes only 133 ms. Because context switches and inter-process communication mechanisms like message queues are avoided, the **implementation** provides good performance." (emphasis added) Appx2639, Ex. 1034, p. 38.

In sum, a fair reading of the above passages of the Delgrossi reference indicates that the term "implementation" as used by Delgrossi refers to the writing of software based on Experimental RFC 1190 for a specific computer environment in order to evaluate and test the performance and completeness of the specification. Delgrossi discloses that RFC-1190 specification was in need of further revisions and thus far from being adopted by the Internet user community. Specifically, Delgrossi concluded that "[s]etup protocols are today still experimental, as experimental are many of the techniques that they adopt." Appx2899, Ex. 2018 Delgrossi, Ch. 11, Conclusion. Based on his user level ST-II implementation in the Heidelberg Transport System (HeiTS), Delgrossi identified deficiencies in the RFC 1190 specification which required the invention of a new transport layer (i.e., Heidelberg Transport Layer "HeiTP") because "some important functions are missing that call for a transport service above it, and the service offered by ST-II needs to be completed by appropriate functions at the transport layer." Appx2909, Appx2914, Delgrossi, Ch. 9. With respect to IP encapsulation of ST packets,

Delgrossi cited deficiencies in the ST-II protocol including: "Data packets loss is not detected by ST-II" and "When the IP encapsulation option is used, it is possible that misordered or duplicated data units are received." Appx2909, Delgrossi, Ch. 9. Delgrossi found it necessary to further revise the ST-II protocol after testing his own ST-II implementation and published yet another Experimental RFC 1819 (ST-2+) specification. Appx2900, Delgrossi, Appendix (RFC1819).

Thus, even though Delgrossi had the "most complete" ST-II implementation at the time, Dr. Delgrossi concluded that Experimental RFC-1190 specification was in need of further revisions (i.e. Experimental RFC 1819 (ST-2+)) and was far from being "adopted" by the Internet user community or by IETF as an "Internet Standard."

### 11. Weinstein-Forgie: Prior Art Experimental Packet Speech Communication Network Using IP for Control and ST Protocol for Speech Transport

The cited reference: "Experimental Speech Communication in Packet Networks" by Clifford J. Weinstein and James W. Forgie (referred hereafter as "Weinstein-Forgie"), published in 1983, discloses an experimental communication system for transporting speech across ARPANET. Appx1610, Ex. 1010 at 1. Weinstein-Forgie discloses that "[p]acket internetworking techniques can be applied to provide intercommunication among voice users on different types of networks." *Id.* The experimental Weinstein-Forgie system employs the Network

27

Voice Protocol (NVP).  "NVP is designed to pass its packets to a lower level protocol for transport across the network to meet real-time speech requirements." It includes high level functions such as "call setup, packetization, and reconstitution."  "The lower level protocol, which has come to be named 'ST,' provides an efficient internet transport mechanism for both point-to-point conversations and conferences." "The name ST is derived from the work 'stream' which refers to the type of traffic load that voice customers offer to a packet network.  ST operates at the same level in the protocol hierarchy as IP, the DoD standard internet protocol for datagram traffic."  "NVP may call on Internet Protocol (IP) for delivery of control packets, and on ST for delivery of voice packets."  "ST differs from IP in being a virtual circuit rather than a datagram protocol.  Transmission of ST packets must be preceded by a connection setup process arranged by an exchange of control messages.  During the connection setup, an internet route is established, and gateways along the path build tables pertaining to the connection." (emphasis added.)  Appx1613, Ex. 1010 at 4.

"IP is used primarily in call setup situations, and ST is used for speech transport."  *Id*.

The below figure illustrates the protocol hierarchy of NVP, ST and IP protocols.



Fig. 3.   Protocol hierarchy for internet packet voice and data communication.

*Id*.

Weinstein-Forgie lists the following requirements for packet speech transmission.

| TABLE III | | |
|---|---|---|
| **THE ST PROTOCOL FOR PACKET SPEECH** | | |
| **Packet Speech Requirements** | | **ST Approach** |
| 1) Guaranteed data rate. | 1) | Know requirements in advance. Request reserved network resources when available (e.g., PODA streams). Assign loads to links statistically in routing virtual circuits. |
| 2) Controlled delay (predictable dispersion). | 2) | Prevent congestion by controlling access on a call basis. |
| 3) Small quantity of speech per packet. | 3) | Set up virtual circuit routes so that abbreviated headers can be used. Aggregate small packets for efficiency. |
| 4) Efficiency equal to or better than circuit switching without TASI. | 4) | Abbreviated headers for packet efficiency. Goal of high link utilization with effective traffic control. |
| 5) Efficient use of broadcast media. | 5) | Control multiaddress setup for conferencing and replicate packets only when necessary. |

Appx1623, Ex. 1010 at 14.

Fig. 12 of Weinstein-Forgie diagrammatically illustrates the experimental packet network as shown below. The ARPANET connections are not shown in the figure.



Appx1624, Ex. 1010 at 15.

According to Weinstein-Forgie, "[t]he new internet ST protocol has been **implemented and tested** successfully both in gateways and in terminals. Interoperation between miniconcentrator and voice funnel gateways has been demonstrated." Appx1625, Ex. 1010 at 16. Weinstein-Forgie concludes that "[t]he successful **implementations and experiments** described here strongly support the conclusion that packet communication is a practical technique for real-time speech communication." *Id*. Thus, the experimental Weinstein-Forgie system

"provided a practical demonstration of the feasibility of packet speech in a large variety of packet network and internetwork environments.  These system **implementations** have provided stimulus for the definition of packet speech requirements and for the successful development of speech processing techniques, voice protocols, packetization and reconstitution strategies, digital voice conferencing, and voice/data multiplexing." *Id*.

Notably, the term "implementation" as used by Weinstein-Forgie refers to the writing of software for testing purposes, which is consistent with the customary meaning of the term.  It does not mean "deployment" or "adoption" of the software by the Internet engineers as implied by the Board in its Final Decision.

### E.     The Level of Ordinary Skill in the Art

Cisco's expert, Dr. Houh, testified that the level of ordinary skill in the art needed to have the capability of understanding the scientific and engineering principles applicable to the '879 Patent is a bachelor's degree in computer engineering or computer science, or equivalent industry or trade school experience in programming software applications and network communications, together with two years of working experience. Appx1540-41, Ex. 1008, Houh Decl., ¶67-68.

## SUMMARY OF THE ARGUMENT

### Obviousness

The Board erred in its obviousness determination: (1) that an ordinary artisan would be motivated to combine the defunct Weinstein-Forgie system with the incomplete and incompatible Experimental RFC 1190 specification; and (2) that an ordinary artisan would have a reasonable expectation of success in combining these prior art references without undue experimentation. The Board's conclusion of obviousness rested on its misapprehension of the "implementation" of Experimental RFC 1190 specification for ST-II protocol (i.e. ST-II implementations) by Internet researchers. The Board mistakenly believed the ST-II implementations reported by Delgrossi (a printed publication) demonstrates adoption of ST-II or the Experimental RFC 1190 specification by the Internet community. But the evidence is to the contrary. Internet researchers were only in the process of testing the RFC1190 specification for completeness and evaluating the feasibility of ST-II for multimedia applications and deployment on the Internet. The Board cited no evidence in the record showing that an incomplete experimental specification or software protocol could yield predictable results without undue experimentation.

Cisco did not submit any direct expert testimony to explain the ST-II implementations reported by the Delgrossi reference. Instead, Cisco relied on

hearsay statements in Delgrossi to allege that the referenced ST-II implementations demonstrate adoption or widespread use by Internet engineers.  In cases involving complex technology, this Court has held that expert testimony is required to explain the teachings of references.  The Board cited no testimonial evidence to support its understanding of the ST-II "implementations" to mean software "adoption."  This is error.  In fact, as used in the references, the term "implementation" refers to the writing of software based on a software specification.

The Board engaged in premature obviousness analysis by failing to evaluate objective considerations in the evidentiary record prior to its obviousness conclusion, and improperly shifted the burden of persuasion to Patent Owner to provide evidence of objective considerations.

The Board engaged in impermissible hindsight reconstruction of the claimed subject matter by looking to the claimed invention to narrowly define the problem the ordinary artisan needed to solve in order to arrive at the claimed invention.  In so doing, the Board apparently believed that it need not determine whether an ordinary artisan would have a reasonable expectation of success in the proffered combination since the claimed invention already demonstrated success.

# ARGUMENT

## A.    <u>Standard of Review</u>

The Federal Circuit in *In re Applied Materials, Inc.*, 692 F.3d 1289, 1294

(Fed. Cir. 2012) has stated:

> Obviousness is a question of law with several underlying factual
> inquiries, including what a reference teaches, whether a reference
> teaches away, and whether there is commercial success. *Graham
> v. John Deere Co. of Kan. City*, 383 U.S. 1, 17-18, 86 S. Ct. 684,
> 15 L. Ed. 2d 545 (1966); *Para-Ordnance Mfg., Inc. v. SGS Imps.
> Int'l, Inc.*, 73 F.3d 1085, 1088 (Fed. Cir. 1995). This court
> reviews the Board's determination of obviousness de novo and the
> Board's factual findings for substantial evidence. *In re Gartside*,
> 203 F.3d 1305, 1316 (Fed. Cir. 2000). Substantial evidence is
> "such relevant evidence as a reasonable mind might accept as
> adequate to support a conclusion." *Consol. Edison Co. v. NLRB*,
> 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938). "[T]he
> possibility of drawing two inconsistent conclusions from the
> evidence does not prevent an administrative agency's finding from
> being supported by substantial evidence." *Consolo v. Fed. Mar.
> Comm'n*, 383 U.S. 607, 620, 86 S. Ct. 1018, 16 L. Ed. 2d 131
> (1966).
>
> The Board's judgment must be reviewed on the grounds upon
> which the Board actually relied. See *Sec. & Exch. Comm'n v.
> Chenery Corp.*, 332 U.S. 194, 196, 67 S. Ct. 1575, 91 L. Ed. 1995
> (1947); *In re Lee*, 277 F.3d 1338, 1345-46 (Fed. Cir. 2002).
> Alternative grounds supporting the Board's decision generally are
> not considered. See *Lee*, 277 F.3d at 1346. "The [Board] must set
> forth its findings and the grounds thereof, as supported by the
> agency record, and explain its application of the law to the found
> facts." *Id.* at 1342. However, "[w]hile we may not supply a
> reasoned basis for the agency's action that the agency itself has
> not given, *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S. Ct.
> 1575, 91 L. Ed. 1995 (1947), we will uphold a decision of less
> than ideal clarity if the agency's path may reasonably be
> discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*,

Inc., 419 U.S. 281, 285-86, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974);
see also *In re Huston*, 308 F.3d 1267, 1280-81 (Fed. Cir. 2002)
(affirming the Board's "cryptic" conclusions because the Board's
path could be discerned and the Board's decision was supported by
substantial evidence (quoting *Bowman*, 419 U.S. at 285-86, 95 S.
Ct. 438)).

B.    **The Board Incorrectly Concluded that the Defunct Weinstein-
      Forgie System and the Incomplete and Incompatible
      Experimental RFC 1190 Specification Rendered the Claimed
      Invention Obvious**

"The obviousness inquiry entails consideration of whether a person of

ordinary skill in the art 'would have been motivated to combine the teachings of

the prior art references to achieve the claimed invention, and ... would have had a

reasonable expectation of success in doing so.' " *Insite Vision, Inc. v. Sandoz,*

*Inc.*, 783 F.3d 853, 859 (Fed. Cir. 2015) (citation omitted)  In the present case,

there is no substantial evidence showing that a person of ordinary skill in the art

would have been motivated to combine the defunct Weinstein-Forgie system with

the incomplete and incompatible Experimental RFC 1190 specification or would

have a reasonable expectation of success in doing so.

The Experimental RFC 1190 itself admits that the specification is deficient

in many respects and incompatible with the original version of ST used in the

defunct Weinstein-Forgie system.  Appx1758-60 (Ex. 1011, RFC 1190 at 131-

133); Appx1628, Appx1635 (Ex.1011, RFC 1190 at 1, 8).  Moreover, the

proposed ST-II protocol is intended "as a vehicle to study the use and

performance of stream oriented services across packet switched networks."
Appx1760.  The fact that it's designated by IETF as Experimental, and not as an
Internet Standard, clearly indicates to an ordinary artisan that the specification is
not ready for deployment in the Internet or to be used as an "upgrade" to any
commercial systems.  Appx2801. Ex. 2011 at 3.  In fact, researchers who
implemented Experimental RFC 1190 specification reported that the specification
is incomplete or that they could not determine ST-II's suitability for multimedia
applications.  See Appx2470-71, Ex. 1030, Herrtwich, at 4-5 ("We are still in the
process of examining feasibility of HeiTS" which "uses the Internet ST-II
protocol as its communication core" for multimedia applications); Appx2907,
Appx2909, Ex. 2018.

     However, the Board failed to appreciate the deficiencies of Experimental
RFC 1190 specification, and erroneously concluded that an ordinary artisan would
be motivated to "upgrade" a defunct experimental Weinstein-Forgie system with
an incomplete Experimental RFC 1190 specification to produce the claimed
invention.  The Board reasoned that Cisco's submitted evidence disclosing ST-II
"implementations" demonstrated "adoption" of ST-II by Internet researchers.  But
according to FCC, an RFC specification is "adopted" when IETF designates the
specification as an "Internet Standard."  Otherwise there would be "chaos" in the
Internet.  Appx2799-2801, Ex. 2011 at 1-3.

Specifically, the Board found that "[Cisco] has submitted evidence of the implementation of ST-II in various systems near the time of invention of the '879 patent" and "that the submitted evidence regarding other internet engineers **implementing systems adopting ST-II** supports a conclusion that a skilled artisan would have been capable of making the necessary correlated changes to hardware in order to implement ST-II." (emphasis added) Appx18-19, Final Decision, p. 18-19. This is error because the Board's conclusion rested on a misreading of the references and, in particular, the meaning of "implementation" in the field of computer science.

Cisco's expert, Dr. Houh, did not provide direct testimony to support Cisco's asserted interpretation of "implementation" to mean "use" or "deployment" of software (which is inconsistent with the ordinary meaning of "implementation" in the field of computer science). None was cited by the Board in its Final Decision. Rather, the Board relied on Cisco's unsupported attorney argument that the ST-II implementations were evidence of *adoption* of ST-II by the ST-II researchers. Appx287-89, Cisco Reply at 7-9.

This Court has emphasized that in cases involving complex technology, expert testimony is required to explain references. This lack of expert testimony led to the Board's misapprehension of the evidence on (1) the term

"implementation" in the field of computer science, (2) the references alleging ST-II "implementations," and (3) the "multi-stage process of suggesting, reviewing, accepting, and issuing standards for the Internet." Appx2801.

As discussed below, the Board erred in its obviousness determination as a matter of law and clearly erred in its factual findings.

### 1.  The Board's Conclusion of Obviousness Is Unsupported By Substantial Evidence

In support of its obviousness conclusion, the Board cited Ex. 1023 (Crowcroft at 1-4) [Appx2168-71], Ex. 1030 (Herrtwich at 4-6) [Appx2470-72] and Ex. 1034 (Delgrossi at 20-21) [Appx2621-22] submitted by Cisco as evidence of "internet engineers **implementing systems adopting** ST-II."  (emphasis added.) Appx19, Final Decision at 19.  The Board cited no other evidence in its obviousness analysis.

Upon careful review, these cited references do not support the Board's conclusion.  Crowcroft stated that it "envisages" the benefits of ST-II in future multimedia applications.  However, Crowcroft does not disclose any ST-II implementation.  Herrtwich discloses ST-II implementations but admits that researchers were still examining the "feasibility" of multimedia applications using HeiTS with ST-II as its core.  Appx2471.  Delgrossi discloses that ST-II is deficient and further revision to ST-II is required (i.e. Experimental RFC 1819 specification (ST2+)).  Appx2900, Appx2906, Appx2909.

38

Thus, the cited references do not disclose any systems "adopting" ST-II for the Internet.  Rather, the ST-II implementations disclosed by Herrtwich and Delgrossi were for experimentation, and not for deployment in the Internet or for adoption by the Internet community.

Importantly, the Board's reliance on Herrtwich and Delgrossi is also improper for a number of other reasons.  Delgrossi was published in 1996 (i.e. after Oct. 1995, the priority date of the earlier filed Israeli patent application IL 1155880) and is thus not prior art to the '879 patent.  The Board may believe the ST-II implementations disclosed by Delgrossi occurred prior to the date of invention of the '879 patent.  But the Board did not make any such factual finding.  Furthermore, Herrtwich and Delgrossi are entitled to little or no evidentiary weight because these references were submitted more than one month after institution of trial in violation of 37 C.F.R. §42.123(b), which states:

> (b) *Late submission of supplemental information*. A party seeking to submit supplemental information more than one month after the date the trial is instituted, must request authorization to file a motion to submit the information. The motion to submit supplemental information must show why the supplemental information reasonably could not have been obtained earlier, and that consideration of the supplemental information would be in the interests-of-justice.

The record shows that Herrtwich (Ex. 1030) and Delgrossi (Ex. 1034) were submitted with Cisco's Reply on November 14, 2014, more than one month after institution of the trial on May 27, 2014.  Appx171.  But Cisco did not request the

Board's explicit authorization to file a motion to submit the information as required by 37 C.F.R. §42.123(b). Appx171, Inst. Dec. at 1; Appx296, Cisco Reply Certificate of Service (showing service of Ex. 1028-1034 with Cisco's Reply). Patent Owner attempted to raise this issue with the Board at the oral hearing. Appx 301-303; Appx311-314; Appx2872-73, Appx2898, Ex. 2018. But the Board did not address the issue at the oral hearing.

Cisco's Reply would not constitute a motion under 37 C.F.R. §42.123(b) because it did not include a request for authorization to submit the supplemental information. The Board did not acknowledge such request and did not rule on the request, expressly or impliedly. The Board simply relied on the improperly submitted supplemental information in its Final Decision. This is error.

For the above reasons, the Board's reliance on the cited evidence relating to ST-II implementations is clearly erroneous in light of 37 C.F.R. § 42.123. In any event, none of the cited evidence demonstrates "adoption" of Experimental ST-II by the Internet community, and thus does not support the Board's finding that "internet engineers implemented systems adopting ST-II." Accordingly, the Board's obviousness determination is not supported by substantial evidence.

**2.    The Board Erred In Its Conclusion of Obviousness Because It Misunderstood the Meaning of "Implementation" of Experimental RFC 1190 Specification**

At the oral hearing before the Board, Cisco argued that "as we saw with Exhibit 1034, looking at demonstrative slide 17, you know, by the early '90s there were many implementations. There were 13 existing implementations when a survey was conducted in 1993. So we saw the RFC was published, researchers were anxious for it to become available in implementations.  Many implementations were made and researchers upgraded their older systems that had been using ST and began using ST-II instead.  And that's exactly the kind of combination that's at the heart of our proposed ground number 1, taking an existing system described by Weinstein, taking the teachings out of Weinstein and combining it with the teachings of ST-II and RFC1190 to have an overall system meeting all of the claim limitations."  Appx365, Oral Hearing Tr., 25:1-15.  The Board agreed with Cisco and concluded "that the submitted evidence regarding other internet engineers **implementing systems adopting ST-II** supports a conclusion that a skilled artisan would have been capable of making the necessary correlated changes to hardware in order to implement ST-II."  (emphasis added.) Appx19, Board Decision, p. 19.  This is error.

The term "implementation" in the field of computer science means the writing of software based on a software specification – typically, for the testing

phase of a software development.  See, e.g., Appx1625, Ex. 1010, Weinstein-Forgie at 16 ("The new Internet ST protocol has been **implemented and tested** …. The successful system **implementations and experiments** described here strongly support the conclusion that packet communication is a practical technique for real-time speech communication.") (emphasis added); Appx2622, Ex. 1034, Delgrossi at 21 ("The implementation consists of about 18.000 lines of code ….")

An implementation is merely one of the many steps in a software development to determine the completeness of the software specification, among other things.  See, e.g., Appx2470-71, Ex. 1030, Herrtwich at 4-5.  Cisco did not provide any evidence, testimonial or otherwise, to support its definition of "implementation" to mean deployment of ST-II software.  The Board did not make any explicit finding on the meaning of the term "implementation" to an ordinary artisan in the field of computer science or Internet engineering.  However, the Board's usage of the term in its Final Decision indicates that it adopted Cisco's usage of the term "implementation" to mean "deployment" or "widespread use" of a software system, which is a subsequent phase of software development following the successful testing of "implementations" of a software specification.  Moreover, according to FCC, in order for a software specification proposed for the Internet to be "adopted" by the Internet community, it would need to be designated as an "Internet Standard" by the IETF.  Appx2801, Ex. 2011 at 3.  Without common

42

standards in the Internet, the Internet would degenerate into chaos according to
FCC.  Appx2799, Ex. 2011 at 1.

The Board's misunderstanding of the term "implementation" stemmed from
Cisco's Reply, in which Cisco asserted, without any supporting direct expert
testimony, that the "widespread use of interoperable implementations of the ST-2
protocol renders it conventional."  Appx287-89, Cisco Reply, p. 7-9.  In other
words, Cisco believes that a high number of "implementations" of the
Experimental ST-2 protocol, regardless of whether they were tested successfully or
not, supports a finding that ST-2 protocol is "conventional," i.e., commonly used
by the Internet community.  However, no matter how many researchers have
written the software or how many experimental platforms were running the test
software for testing by the Internet researchers, the experimental ST-2
implementations cannot be viewed as "adoption" by the Internet community.  In
fact, according to FCC, it is the IETF, not the Internet researchers, that determines
which software specification is to be adopted as an Internet Standard for the
Internet.  Appx2801.

A reasonable inference from the number of "implementations" disclosed or
alleged by the cited references is that the Internet researchers exhibited a level of
interest in evaluating the Experimental RFC 1190 specification.

Cisco's expert, Dr. Houh, did not define the term "implementation" to mean software "deployment" in his Declaration but he did use the term "implement" in describing a prior art software reference ("Aldred"[1]).  He stated that Aldred describes a "call manager that implements the concept of a call and provides mechanisms for sharing real-time voice links, video links, and documents." Appx1588, Ex. 1008, Houh Decl. ¶114; Appx1776, Appx1804, Ex. 1012, Aldred at 29.  Dr. Houh's and Aldred's usage of the term "implement" is consistent with its customary meaning.  See Appx1798-1800, Appx1804 (Ex. 1012, Aldred, at 23-25, 29).  Patent Owner's expert, Dr. Weinstein, also expressly distinguished the "implementation" phase of software development from the "deployment" phase during his cross examination by Cisco counsel.  Appx2419-20, Ex. 1029, Weinstein Tr., 107:10-108:2 ("It says implemented, not necessarily deployed."). Indeed, there is no record evidence to support Cisco's assertion that "implementation" means "adoption" or deployment of software.

Moreover, Cisco did not cite any evidence in support of its assertion that the various ST-II implementations were indeed "interoperable" other than Delgrossi's unsupported allegation of interoperability, a hearsay statement.  See Appx288, Cisco's Reply at 8.  But Delgrossi's uncorroborated allegation must be carefully

---

[1] Aldred (Ex. 1012) is WIPO International Publication No. WO 94/11813, titled "Call Management in a Collaborative Working Network," and published on May 26, 1994.  Appx1776.

examined in light of RFC1190's caution that only similarly subsetted ST-II implementations could interoperate.  Appx1636, Ex. 1011 at 9.  Delgrossi fails to disclose whether any of the reported ST-II implementations were full implementations or similarly subsetted implementations for interoperability.

If the Board understood "implementation" to mean the writing of software based on a specification for testing, it would not have characterized or described "systems as adopting ST-II" because adoption implies the ST-II protocol was deployed in software systems and that engineers were commercially using ST-II in the Internet, rather than testing or otherwise conducting research on the incomplete Experimental RFC 1190 specification.  Accordingly, the Board's conclusion is not supported by substantial evidence.

As this Court has pointed out, in cases involving complex technology, expert testimony is required to explain what the references disclose.  This Court in *Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336, 1348 (Fed. Cir. 2013) has stated:

> Expert testimony was required not only to explain what the prior-art references disclosed, but also to show that a person skilled in the art would have been motivated to combine them in order to achieve the claimed invention.

See also, *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1240 n.5 (Fed. Cir. 2010) ("As we noted in *Centricut*, 'expert testimony regarding matters beyond the comprehension of laypersons is sometimes essential,' particularly in cases involving complex technology." (quoting *Centricut, LLC v. Esab Group, Inc.*, 390

F.3d 1361, 1369-70 (Fed. Cir. 2004)); *Innogenetics, N.V. v. Abbott Labs*, 512 F.3d 1364 (Fed. Cir. 2008) (requiring a heightened burden of explanation in an expert report regarding motivation to combine references for a technology involving the detection and classification of hepatitis C genotypes in a biological sample).

In this case, Internet engineering is complex and the associated phases of software development (e.g., software implementation and deployment) for use in the Internet are not easily understood without appropriate expert testimony. Both parties also relied on their respective experts to explain the complex networking technologies. Moreover, the cited references such as Delgrossi are printed publications and are thus hearsay statements. Therefore, Cisco cannot complain that direct expert testimony is required to explain how an ordinary artisan would understand the ST-II implementations disclosed in its submitted references and the veracity of the hearsay statements in the printed publications.

In any event, none of the ST-II implementations cited by Cisco was for commercial "use" by the ST-II researchers. Rather, the evidence shows that the ST-II implementations were part of an ongoing research and testing of Experimental RFC 1190 specification by various Internet researchers. See, e.g., Appx2621-22, Ex. 1034, Delgrossi, at 20-21; Appx2471, Ex. 1030, Herrtwich at 5.

Accordingly, the Board's factual findings are clearly erroneous because the Board misapprehended Internet researchers' testing of ST-II implementations to

mean "widespread use" of the Experimental ST-II protocol by the researchers or deployment of the Experimental ST-II protocol on the Internet. The Board's obviousness conclusion is therefore erroneous as a matter of law.

> **3.      The Defunct Weinstein-Forgie System and the Incomplete and Incompatible RFC 1190 Specification Are So Flawed That An Ordinary Artisan Would Not Be Motivated to Combine Them**

There is no substantial evidence that an ordinary artisan would be motivated to combine the defunct Weinstein-Forgie system with the incomplete and incompatible Experimental RFC 1190 specification. Notwithstanding references such as Delgrossi (Ex. 1034) which disclose that ST-II remained experimental and deficient, and the ARAPNET, which was the hub of the Weinstein-Forgie system, was decommissioned prior to the invention of the '879 patent, the Board "was persuaded by [Cisco's] arguments that an ordinary skilled artisan would have found it obvious to consider **upgrading** ST to ST-II, the version available at the time of invention of the '879 patent." (emphasis added.) Appx19, Final Decision at 19; Appx2797, Ex. 2010 at 1. The Board concluded that "[o]ne would not have needed to 'resurrect' the defunct ARPANET to take advantage of Weinstein's teachings regarding combining voice networks with data networks. Rather, one would have gleaned the knowledge necessary to create a system using a data network to transport voice communication as a bridge between conventional telephony networks." *Id.*

AIP respectfully submits that the Board's conclusion is not supported by substantial evidence because the Board cited no evidence on the motivation to combine the references or to "upgrade" the defunct Weinstein-Forgie system with an incompatible and incomplete Experimental RFC 1190 specification. An ordinary artisan would not consider Experimental ST-II an "upgrade" to the original version of ST in light of the admission of the authors of Experimental RFC 1190 that there are numerous issues not yet addressed and that the proposed ST-II is intended to be "a vehicle to study the use and performance of stream oriented services across packet switched networks." Appx1758-60, Ex. 1011 at 131-133. Experimental RFC1190 also explicitly stated that ST-II is not compatible with the original version of ST. Appx1628, Appx1635. Thus, Experimental ST-II is not a known technique that is intended as a simple substitute of the original version of ST. Cisco presented little or no evidence on this issue. The only evidence that Cisco presented, beyond the content of the cited documents, is the cursory testimony of its expert, Dr. Houh. Appx1553-55, Ex. 1008, Houh Decl., ¶108-111. Specifically, Dr. Houh testified that (1) "it is merely the use of a known technique to improve similar devices in the same way" because "RFC 1190 teaches that encapsulating ST protocol in IP (an internet protocol) allows interconnections across any part of the Internet, regardless of whether the routers along the path support the ST protocol and that applying the same ST protocol encapsulation

48

technique to the system of Weinstein would have improved Weinstein's system in the same way," and alternatively (2) "the combination of Weinstein-Forgie and RFC 1190 is merely the simple substitution of one known element for another to obtain predictable results" because "it is merely the substitution of the ST-II protocol (taught by RFC 1190) for the ST protocol originally used in Weinstein, where ST-II itself is an internet protocol (as taught by RFC 1190). The substitution provides the predictable result of a voice packet communication system using a protocol that can interconnect any two endpoints on the Internet." *Id*.

But Experimental RFC 1190 itself states that it is incomplete and Delgrossi teaches that ST-II is deficient and proposes yet another revised Experimental RFC 1819 specification (ST2+). The benefit of interconnecting "any two endpoints on the Internet" would also be unattainable in view of Delgrossi's disclosure that RFC 1190 is incomplete and fails to address IP encapsulated ST-II packets (e.g., misordered, duplicated, or lost packets). Thus the substitution is not simple and the benefits touted by Dr. Houh or proposed in the incomplete and incompatible Experimental RFC 1190 specification could not be realized without undue experimentation.

Furthermore, Dr. Weinstein testified that "[f]ailure to address missing or late delivered packets in the experimental system that was based on a virtual circuit protocol could render the system inoperative." Appx2865-66, Ex. 2013, Weinstein

Decl. ¶67-72. Delgrossi also cited the same deficiencies including: "Data packets loss is not detected by ST-II" and "When the IP encapsulation option is used, it is possible that misordered or duplicated data units are received." Appx2909, Delgrossi, Ch. 9. AIP is not aware of any evidence in the record that contradicts these findings. None was cited by the Board in its Final Decision.

Dr. Houh ignored the fact that Experimental RFC 1190 specification is experimental and incomplete, and which is nothing more than a proposal to the Internet community. Appx1758-60, Ex. 1011, RFC 1190 at 131-133 ("We hope that the ST we here propose will act as a vehicle to study the use and performance of stream oriented services across packet switched networks." Appx1760). Indeed, there is no evidence in the record showing that the testing of ST-II protocol by the research community was completed and that ST-II was ready for deployment as an Internet Standard in the Internet. Appx2863-65, Ex. 2013, Weinstein Decl. ¶61-66 ("ST-II has not been accepted as a standard by the telecommunication industry"). An incomplete Experimental ST-II protocol cannot be fairly called a "known" technique that can be readily applied with predictable results.

Dr. Houh also ignored the fact that Experimental RFC 1190 specification discloses that the unproven ST-II protocol is incompatible with the original version of ST used in the Weinstein-Forgie system. Appx1628, Appx1635-36, Ex. 1011, RFC 1190 at 8-9. Since Experimental RFC 1190 was published in October 1990,

more than seven (7) months after ARPANET was decommissioned in February 1990, it is highly doubtful that the authors of Experimental RFC 1190 proposed ST-II for the defunct and Weinstein-Forgie system which utilized the decommissioned ARPANET as the hub of its network.  Therefore, an ordinary artisan would not reasonably conclude that ST-II is "merely the simple substitution of one known element for another."  Furthermore, there is no evidence that the ST-II software based on Experimental RFC 1190 specification was ever written, i.e. implemented, for or applicable to the Weinstein-Forgie system that would enable an ordinary artisan to improve the defunct Weinstein-Forgie system.  Without the availability of a complete and satisfactorily tested ST-II implementation for the defunct Weinstein-Forgie system, it cannot be fairly said that an ordinary artisan would be motivated to substitute ST with the incompatible and incomplete ST-II in the defunct Weinstein-Forgie system.  Importantly, in light of Delgrossi's disclosure that Experimental RFC 1190 specification is incomplete and deficient and requires further revisions, there is reasonable ground to doubt that the ordinary artisan would be capable of substituting ST with ST-II in the complex and defunct Weinstein-Forgie system without undue experimentation.  Appx2906-07, Ex. 2018 at 34-35.

Dr. Houh opined that it was ARPANET that formed the hub of the "Internet," not SATNET.  Appx1514-15, Ex. 1008, Houh Decl. ¶26-27.

Apparently, without the hub, i.e. ARPANET, the disparate networks would not be able to communicate with each other. Dr. Houh did not explain how the disparate networks of the Weinstein-Forgie system, which used ARPANET to interconnect other networks (including SATNET), could communicate with each other otherwise or provided any evidence on any continuing research on the Weinstein-Forgie system at the time of invention of the '879 patent. Accordingly, the Weinstein-Forgie system is so flawed that an ordinary artisan would not be motivated to modify its hardware and to upgrade the software with an incomplete and incompatible ST-II protocol.

Cisco contended that an ordinary artisan is not an automaton such that the ordinary artisan could combine the defunct Weinstein-Forgie system with the incomplete and incompatible Experimental RFC 1190 specification. However, in cases involving complex networking technology such as the present case, an expert's testimony is required to explain how an ordinary artisan would be able to extrapolate the test results of the ST-II implementations and apply the teachings to successfully complete the Experimental RFC 1190 specification and to successfully test an ST-II implementation in the defunct Weinstein-Forgie system. *Alexsam* at 1348. See Appx2470-71, Ex. 1030, Herrtwich at 4-5; Appx2900, Appx2907-10, Ex. 2018 at 28, 35-38. In light of Delgrossi's disclosure of further revisions to the deficient RFC 1190 specification (i.e. RFC 1819) and the

admissions of the authors of Experimental RFC 1190 specification that the

specification is incomplete and requires experimentation, an ordinary artisan could

require undue experimentation to complete the deficient Experimental RFC 1190

specification and to deploy a satisfactorily tested ST-II protocol in the defunct

Weinstein-Forgie system – assuming *arguendo* the ordinary artisan may possess

the skills of an expert Internet researcher such as Delgrossi (which Cisco failed to

prove).

 The Supreme Court in *KSR Int'l v. Teleflex*, 127 S. Ct. 1727, 1741 (2007),

has explained that "a patent composed of several elements is not proved obvious

merely by demonstrating that each of its elements was, independently, known in

the prior art.  Although common sense directs one to look with care at a patent

application that claims as innovation the combination of two known devices

according to their established functions, it can be important to identify a reason

that would have prompted a person of ordinary skill in the relevant field to

combine the elements in the way the claimed new invention does. This is so

because inventions in most, if not all, instances rely upon building blocks long

since uncovered, and claimed discoveries almost of necessity will be combinations

of what, in some sense, is already known." However, the reason to combine is a

question of factual evidence and it matters what evidence is submitted in a given

case to demonstrate that the reason would in fact have motivated an asserted

combination.  See, e.g., *Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336, 1347-48 (Fed. Cir. 2013); *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1368-69 (Fed. Cir. 2012).

The demise of ARPANET and Weinstein-Forgie system could not provide the requisite motivation to a person of ordinary skill in the art to upgrade.  Neither does Experimental RFC 1190, an incomplete experimental specification which was being actively tested by various researchers at the time of invention of the '879 patent.  It would not be an "upgrade" to replace a functional ST in the Weinstein-Forgie system with an incompatible and incomplete Experimental ST-II protocol when other researchers were still examining the feasibility of multimedia applications using ST-II.  See Appx2471, Ex. 1030, Herrtwich at 5.

Therefore, the Board's conclusion that "an ordinary skilled artisan would have found it obvious to consider upgrading ST to ST-II" is not supported by substantial evidence.

### 4.    No Substantial Evidence that Defunct Weinstein-Forgie Can Be Combined with Experimental RFC 1190 Specification with Reasonable Expectation of Success

There is no substantial evidence that an ordinary artisan who has a bachelor's degree in computer engineering or computer science, or equivalent industry or trade school experience in programming software applications and network communications, together with two years of working experience would

have a reasonable expectation of success in substituting ST in the defunct

Weinstein-Forgie System with the incomplete and incompatible ST-II to produce

the claimed invention.   The evidentiary record shows that the experts in the field

had yet to create a deployable version of ST-II for the Internet, i.e. a version of ST-

II that could be adopted as an Internet Standard by the IETF.  Indeed, Delgrossi

discloses that Experimental RFC 1190 specification is incomplete and requires

further revisions (i.e. Experimental RFC 1819 (ST-2+)) and experimentation, and

Herrtwich discloses that researchers were still in the process of examining

"feasibility" of HeiTS and ST-II for multimedia applications at the time of

invention of the '879 patent.  Appx2900, Appx2906-07, Appx2909, Ex. 2018 at

29, 35, 37; Appx2471, Ex. 1030, Herrtwich at 5.  Accordingly, there is reasonable

ground to doubt that an ordinary artisan would have a reasonable expectation of

success with the proffered combination.

    In order to combine the defunct Weinstein-Forgie system with the

incomplete and incompatible Experimental RFC 1190 specification, an ordinary

artisan would need to know at least the required interfaces between ST-II and the

Weinstein-Forgie system, information that is not available to even the architects of

the Weinstein-Forgie system or to the authors of the RFC 1190 specification.   The

Board cited no evidence relating to such interfaces.  Without this knowledge or

some engineering principles from which the ordinary artisan could use to predict

results of the proffered combination, an ordinary artisan would have to acquire the requisite knowledge through experimentation. Given the incomplete nature of Experimental RFC 1190 specification and the lack of information on the ST-II interfaces for the defunct Weinstein-Forgie system, there is reasonable ground to conclude that an ordinary artisan would have had to engage in undue experimentation with a resurrected Weinstein-Forgie system.

The Board stated that evidence of "other internet engineers implementing systems **adopting** ST-II supports a conclusion that a skilled artisan would have been capable of making the necessary correlated changes to hardware in order to implement ST-II." (emphasis added) Appx19, Final Decision at 19. The Board's conclusion is erroneous. The fact that Internet researchers could implement a subset of ST-II, i.e., write software based on a subset of the Experimental RFC 1190 specification, has no bearing on an ordinary artisan's ability to make hardware changes to the defunct Weinstein-Forgie system. According to Cisco, the ordinary artisan is skilled in programming software applications and network communications. There is no evidence showing that the ordinary artisan has the requisite skills to modify hardware such as the defunct Weinstein-Forgie system for experimentation with the incomplete and incompatible ST-II protocol.

There is also no evidence showing that the level of skill of such ordinary artisan is the same or equivalent to that of a highly skilled Internet researcher such

as Delgrossi, who invented a new transport layer to remedy some of the deficiencies of Experimental RFC 1190 specification and to create a revised specification such as RFC 1819 (ST-2+).  Appx2900, Appx2909, Ex. 2018; Appx1758-60, Ex. 1011 at 131-133.  Delgrossi uncovered and remedied other ST-II deficiencies during his experimentation with his ST-II implementation but it would be unreasonable to conclude that Delgrossi fixed or could have fixed all of the deficiencies of the Experimental RFC 1190 specification in light of his publication of Experimental RFC 1819 (ST2+) for additional testing.  See, e.g., Appx2900.

In order for an ordinary artisan to substitute ST with the incomplete and incompatible ST-II in the defunct Weinstein-Forgie system, there must be evidence that the substitution would produce predictable result.  As this Court in *In re Cyclobenzaprine Hydrocholoride*, 676 F.3d 1063, 1070-71 (Fed. Cir. 2012), stated:

> Where a skilled artisan merely pursues "known options" from "a finite number of identified, predictable solutions," the resulting invention is obvious under Section 103.  *KSR*, 550 U.S. at 421, 127 S. Ct. 1727.  Where, however, a defendant urges an obviousness finding by "merely throw[ing] metaphorical darts at a board" in hopes of arriving at a successful result, but "the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful," courts should reject "hindsight claims of obviousness."

Indeed, Experimental RFC 1190 presents numerous areas to be addressed by

the Internet researchers.  None of the cited references provides any indication to an

ordinary artisan which of the many possible choices is likely to be successful.

Even if the Board determined that it would be "obvious to try" such a

substitution, the Board must cite evidence that would support a finding that the

proposed implementation of the incomplete and incompatible ST-II in the defunct

Weinstein-Forgie could be expected to produce predictable results. This Court

explained:

> Evidence of obviousness, especially when that evidence is proffered
> in support of an "obvious-to-try" theory, is insufficient unless it
> indicates that the possible options skilled artisans would have
> encountered were "finite," "small," or "easily traversed," and that
> skilled artisans would have had a reason to select the route that
> produced the claimed invention. *Ortho-McNeil Pharm., Inc. v. Mylan
> Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008) (citing *KSR*, 550
> U.S. at 421, 127 S. Ct. 1727). While it is true that Section 103 bars
> patentability unless "the improvement is more than the predictable use
> of prior art elements according to their established functions," *KSR*,
> 550 U.S. at 417, 127 S. Ct. 1727, where the prior art, at best, "[gives]
> only general guidance as to the particular form of the claimed
> invention or how to achieve it," relying on an "obvious-to-try" theory
> to support an obviousness finding is "impermissible." *In re Kubin*, 561
> F.3d 1359 (quoting *In re O'Farrell*, 853 F.2d at 903).

*Id*. at 1072-73.

The Board cited no evidence showing the finite number of identified,

predictable solutions for resolving the ST-II deficiencies available to an ordinary

artisan at the time of invention of the '879 patent.  Absent such evidence, there is

reasonable ground to conclude that the proffered combination of Weinstein-Forgie system and incomplete Experimental RFC 1190 specification would require undue experimentation, assuming *arguendo* an ordinary artisan could resurrect ARPANET and the defunct Weinstein-Forgie system to conduct the experiments at the time of invention of the '879 patent.

The Board stated that "the fact that ARPANET no longer existed at the time of invention of the '879 patent does not render all of the teachings of Weinstein unavailable to the hypothetical person of ordinary skill in the art."  However, even if all of the teachings of Weinstein-Forgie remained available at the time of invention of the '879 patent, an ordinary artisan would still need to resolve myriad unknown variables such as the interface required for implementing ST-II in the defunct Weinstein-Forgie system to address the incompatibilities between ST and ST-II in addition to the numerous deficiencies expressly disclosed in RFC 1190 and those reported by Internet researchers.

Inexplicably, the Board did not acknowledge or address the deficiencies of Experimental RFC 1190.  The Board also did not address how an ordinary artisan could resolve the incompatibilities between ST-II and the original version of ST tested in the Weinstein-Forgie system.  Apparently, the Board viewed these issues as minor "upgrade" issues based on its misapprehension of the evidence relating to ST-II "implementations."  This is error.

In sum, there is no substantial evidence demonstrating that an ordinary artisan having the level of skill asserted by Cisco would be able to combine the defunct experimental Weinstein-Forgie system and the incomplete and incompatible Experimental RFC 1190 specification with a reasonable expectation of success without undue experimentation.

### 5.    The Board Erred In Its Analysis of Objective Considerations

The Board acknowledged Patent Owner's contention that "the references cited by [Cisco], including Weinstein, 'show a long felt need for a packet voice system at least as early as 1976,' but that Weinstein 'failed to gain adoption by the industry' and '[s]ince then no one developed an intelligent voice routing system that bridges incompatible telecommunication networks via a conventional data network that uses an internet protocol as recited in Claim 1 of the '879 Patent.' " Final Decision at 20. The Board, however, found that Patent Owner "presented no evidence of any actual attempts of others, which have failed." The Board further stated Patent Owner did not "establish any reasons why Weinstein was not adopted, or other systems were not developed, that would show a failure to find a solution." *Id.*

The Board is clearly erroneous in its factual findings and legally erroneous in its analysis of the objective considerations.

It is submitted that the references including Weinstein-Forgie, Experimental RFC 1190 specification, Herrtwich, and Delgrossi show a long felt need and failure of others in developing the claimed invention.  Experimental RFC 1190 specification, which explicitly discloses that ST-II protocol is deficient, remained designated as Experimental (i.e., not an Internet Standard) at the time of invention of the '879 patent even though Internet researchers such as Herrtwich and Delgrossi reported their extensive efforts in implementing and testing the specification.  Appx2471, Appx2900.  Herrtwich discloses that feasibility of using ST-II protocol for multimedia application had yet to be examined.  Appx2471.  Delgrossi uncovered additional deficiencies in the Experimental RFC 1190 specification including IP encapsulation of ST-II packets and concluded further experimentation is required and published a revised Experimental ST-II specification, i.e. Experimental RFC 1189 (ST2+), in 1996 – six years after the publication of RFC 1190.   Appx2900.  No record evidence discloses successful completion of the testing of Experimental RFC 1190 specification for multimedia applications.  Moreover, the experimental Weinstein-Forgie system which demonstrated feasibility of ST-based packet speech system became a defunct system when the core of the Weinstein-Forgie system, ARPANET, was decommissioned in 1990.  Appx2797.

The Board failed to recognize these references as evidence of nonobviousness in its obviousness inquiry. The Board stated that "[t]o show failure of others, the evidence must establish that others skilled in the art tried and failed to find a solution for the problem solved by the appellant." Final Decision at 20. This is error. The evidentiary record shows no adoption or deployment of the ST-II protocol, i.e. as an Internet Standard, by the Internet community at the time of invention of the '879 patent. ST-II was further revised by Delgrossi in 1996 as ST2+, another Experimental protocol. Appx2900. This failure of adoption of ST-II protocol (which is intended for use in the Internet) by the Internet community is evidence of failure of others to produce the claimed invention.

The Board also erred in its obviousness analysis by requiring Patent Owner to show "*widespread* efforts of skilled workers having knowledge of the prior art had failed to find a solution to the problem" and to establish "reasons why Weinstein was not adopted, or other systems were not developed, that would show a failure to find a solution." Final Decision at 20. This is not the law, to the extent the Board requires a rigid, formulaic standard for a proper showing of "long felt need' and "failure of others."

This Court in *In re Cyclobenzaprine Hydrocholoride*, 676 F.3d at 1081 explained:

Evidence that others tried but failed to develop a claimed invention may carry significant weight in an obviousness inquiry." While absolute certainty is not necessary to establish a reasonable expectation of success, there can be little better evidence negating an expectation of success than actual reports of failure." *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1354 (Fed. Cir. 2003). This is particularly true when the evidence indicates that others found development of the claimed invention difficult and failed to achieve any success. *Advanced Display Sys. v. Kent State Univ.*, 212 F.3d 1272, 1285 (Fed. Cir. 2000). In such circumstances, "evidence of failed attempts by others could be determinative on the issue of obviousness." Id.

In this case, a competitor, ALZA, failed to develop the claimed solution of an extended-release formulation. The Court held that "[t]he evidence of ALZA's failure to develop an extended-release formulation strongly supports a nonobviousness finding." *Id.* Notably, this Court's evaluation of the "failure of others" factor did not include an analysis of how "widespread" was the failure or the reason for ALZA's failure.

The Board, as did the district court in *In re Cyclobenzaprine Hydrocholoride*, appeared to have arrived at an obviousness conclusion prior to an evaluation of the objective considerations and by so doing, shifted the burden of proving nonobviousness onto the Patent Owner. This shift of burden is evident in the Board's finding that the "Patent Owner presented no evidence of any actual attempts of others, which have failed" even though the evidence of record demonstrates long-felt need and failure of others. The Board's premature obviousness analysis is demonstrated by its statement, prior to its evaluation of the

objective considerations, that "We are persuaded by [Cisco's] arguments that an ordinary skilled artisan would have found it **obvious** to consider upgrading ST to ST-II, the version available at the time of invention of the '879 patent." (emphasis added)  Final Decision at 19.  Thus, the Board already made its obviousness determination prior to its analysis of the objective considerations.  As this Court pointed out, objective considerations are part and parcel of an obviousness analysis under *Graham*, not a burden to be shifted to the Patent Owner to prove nonobviousness after a finding of obviousness.  *In re Cyclobenzaprine Hydrocholoride* at 1075-76.  But this is what the Board did in its analysis.  Thus, the Board's obviousness analysis is erroneous as a matter of law.

For these additional reasons, the Board's obviousness determination is erroneous and not supported by substantial evidence.

### 6.    The Board Engaged In Hindsight Reconstruction of the Claimed Invention

Hindsight is inferred when the specific understanding or principle within the knowledge of one of ordinary skill in the art leading to the modification of the prior art in order to arrive at appellant's claimed invention has not been explained. *In re Rouffet*, 149 F.3d 1350, 1358 (Fed. Cir. 1998).

The Board stated that an ordinary artisan need not "resurrect the defunct ARPANET to take advantage of Weinstein's teachings regarding combining voice networks with data networks" because "one would have gleaned the knowledge

necessary to create a system using a data network to transport voice communication as a bridge between conventional telephony networks." The Board apparently defined the problem by looking to the claims of the '879 patent and determined that no further knowledge is required by the ordinary artisan to combine the Weinstein-Forgie system with Experimental RFC 1190. This selective version of the facts constitutes impermissible hindsight reconstruction of the claimed invention. The Board did not explain why this "gleaned" knowledge would alleviate the need to resurrect the Weinstein-Forgie system for experimentation with the incomplete and incompatible Experimental ST-II protocol or otherwise would enable the ordinary artisan to combine Weinstein-Forgie with the incomplete RFC 1190 with a reasonable expectation of success. The Board cited no competent evidence to support this conclusion. By so doing, the Board improperly defined the problem such that an ordinary artisan would narrow its research focus to lead to the invention. See *Insite Vision Inc. v. Sandoz, Inc.*, 783 F.3d 853, 860 (Fed. Cir. 2015) ("Whether a person of ordinary skill in the art would narrow the research focus to lead to the invention depends on the facts."). The Board appeared to have developed the hunch that the invention is obvious and then constructed a selective version of facts that confirmed its hunch. "Such judicial hunches are encouraged by hindsight bias." *In re Cyclobenzaprine Hydrocholoride* at 1079.

Since the Board's obviousness determination is unsupported by substantial evidence, one would be compelled to conclude that the Board relied on impermissible hindsight in the combination of the defunct Weinstein Forgie system and incomplete and incompatible Experimental RFC 1190 specification. "While the Supreme Court made clear that a mechanical application of the teaching-suggestion-motivation test, requiring an explicit teaching in the prior art, is inappropriate, '[w]e must still be careful not to allow hindsight reconstruction of references to reach the claimed invention without any explanation as to how or why the references would be combined to produce the claimed invention.'" *Kinetics Concept*, 688 F.3d at 1368.

## CONCLUSION

For the aforementioned reasons, the Board's obviousness conclusion is not

supported by substantial evidence.  Patent Owner respectfully requests this Court

to reverse the Board's decision that claims 1-8, 12, 14 and 15 of the '879 patent are

unpatentable.

Date: <u>November 2, 2015</u>                    <u>/s/ Chi Eng                          </u>
Chi Eng
Eng Law Firm
One Gateway Center, Suite 2600
Newark, NJ 07102
Email: chi@englawfirm.com
Telephone: 646-770-2347
Facsimile:  646-568-7231

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that, on this the 2nd day of November, 2015, I electronically filed the foregoing Brief of Appellant with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with United Parcel Service for delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Melissa A. Dockery
Melissa A. Dockery
GIBSON MOORE APPELLATE SERVICES
P.O. Box 1460
Richmond, VA 23218

## CERTIFICATE OF COMPLIANCE
### With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains <u>13,028</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word</u> in <u>14 Times New Roman</u>.

Dated: November 2, 2015                    <u>/s/ Chi Eng_____</u>
                                           Chi Eng

# <u>ADDENDUM</u>

Trials@uspto.gov                                                                          Paper 39
571-272-7822                                                              Date:  May 20, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

CISCO SYSTEMS, INC.,
Petitioner,

v.

AIP ACQUISITION LLC,
Patent Owner.

_____

Case IPR2014-00247
Patent 7,724,879 B2

_____

Before JAMESON LEE, HOWARD B. BLANKENSHIP, and
JUSTIN BUSCH, *Administrative Patent Judges.*

BUSCH, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

I. BACKGROUND

Cisco Systems, Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.")

requesting *inter partes* review of claims 1–15 of U.S. Patent No. 7,724,879

B2 ("the '879 patent") under 35 U.S.C. §§ 311–319.  On May 27, 2014, the

IPR2014-00247
Patent 7,724,879 B2

Board instituted an *inter partes* review of claims 1–8, 12, and 15 on one asserted ground of unpatentability and of claim 14 on another ground of unpatentability ("Dec. on Inst."). Paper 14, 34. Subsequent to institution, AIP Acquisition LLC ("Patent Owner") filed a Patent Owner Response ("PO Resp."). Paper 21. Petitioner filed a Reply ("Pet. Reply") to the Patent Owner Response. Paper 26. Oral hearing was held on January 7, 2015.[1]

The Board has jurisdiction under 35 U.S.C. § 6(c). This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 1–8, 12, 14, and 15 are unpatentable.

### A. *The '879 Patent (Ex. 1001)*

The '879 patent, which expired on October 11, 2014, relates to methods for allowing "communication between otherwise incompatible communication networks in a manner that is transparent to the calling party." Ex. 1001, 1:61–63. For example, claimed methods allow the Internet, or another data network, to function like a telecommunications network. *Id.* at 6:36–38. Calling parties may dial remote locations for the price of a local access and service fee to have voice conversations with called parties in those locations and to avoid using long distance carriers. *Id.* at 6:38–42. In order to make such calls, a local system may be dialed via computer access or a regular telephone, which prompts the calling party for the called party's telephone number or other identification. *Id.* at 6:42–44. The calling party then is connected to the called party over the Internet or

---

[1] The record includes a transcript of the oral hearing ("Hr'g Tr."). Paper 38.

IPR2014-00247
Patent 7,724,879 B2

another data network, such as by connecting the parties via a node through a local call or through other networks. *Id.* at 6:44–47. For example, a calling party may access a node that converts the telephone transmission (e.g., the voice transmission) into data supported by the network chosen by the node. *Id.* at 6:47–49. In this example, a network may connect to another node proximate to the called party that then converts the data transmission back into a voice communication and converts the voice communication into a local call to the called party with the called party node operated by an independent service provider located elsewhere, such as in another country. *Id.* at 6:49–54.

A method, as recited in the claims under review, is illustrated by the conceptual block diagram in Figure 9, reproduced below:



Figure 9 provides an overview of the transmission flow between a calling party and a called party. *See id.* at 6:36–56. In Figure 9 of the '879 patent, a conceptual block diagram depicts the principles of operation of the method, as recited in independent claim 1, for transmitting voice communications between a calling party and a called party over a data network or another

3

network.  *Id.* at 4:3–4, 14:27–45.  The calling party at calling location 48
transmits a call to calling party access device 12 via intercept 16 over link
50A.  *Id.* at 14:62–15:3.  Intercept 16 may be part of central local node 18.
*Id.* at 15:11–12.  Local node 18 receives transmissions from access device
12, converts those transmissions from a first format (e.g., a
telecommunication protocol) to "an internet protocol" for transmission over
data network 20, and sends the converted transmissions over data network
20 in order to establish and transmit voice communication for a phone call
with called party access device 14.  *Id.* at Fig. 9.

As an alternative to communicating through data network 20,
additional two-way direct link connections 46A–E are depicted.  *Id.* at
14:29–36.  Through these connections, calling party access device 12 may
route communications to called party access device 14 via either
communications network $10^2$ or another network 200, such as a cellular,
Asynchronous Transfer Mode (ATM), or frame relay network.  *Id.*; *see id.* at
7:34–39.  Access device 14 may receive the voice communication via a
central local node 24 and/or a central office 22.  *Id.* at 15:4–8.  Central local
node 24 and central office 22 may be separate components.  *Id.* at 15:12–14.
The transmissions are converted from the internet protocol (in the case
where the transmission was transmitted over data network 20) to another
format suitable for reception by access device 14, such as the
telecommunications protocol from which the transmissions were converted
originally.  *See id.* at 4:34–42.

---

[2] In Figure 9 of Ex. 1001, communications network 10 is identified as "voice
network 10."

4

IPR2014-00247
Patent 7,724,879 B2

*B. Illustrative Claim*

Independent claim 1, which is the only independent claim and is illustrative of the subject matter, is reproduced below:

> 1.  A method for communication between two access devices via one or more networks, comprising the steps:
>
> receiving a transmission in a first format through a first communication network from a first access device, the first format comprising a telecommunication protocol for establishing and transmitting voice communication for a phone call in one of a digital telephone network, an analog telephone network, and a cellular network;
>
> performing a first conversion converting the transmission from the first format to a second format, the second format being an internet protocol;
>
> sending the converted transmission through a second communication network, the second communication network being a data network, for reception by a second access device; and
>
> performing a second conversion further converting the converted transmission from the second format to a further format suitable for the second access device, wherein the first access device and the second access device comprise telecommunication nodes, and said further format comprises said first format or another telecommunication protocol.

*C. Related Proceedings*

Petitioner identified the following district court actions in which the '879 patent is involved:  *AIP Acquisition LLC v. Cox Communications Inc.*, Civ. Action No. 12-01691 (D. Del.); *AIP Acquisition LLC v. Charter Communications Inc.*, Civ. Action No. 12-01689 (D. Del.); *AIP Acquisition LLC v. Comcast Corp.*, Civ. Action No. 12-01690 (D. Del.); *AIP Acquisition LLC v. Time Warner Cable Inc.*, Civ. Action No. 12-01692 (D. Del.); and *AIP Acquisition LLC v. Cablevision Systems Corp.*, Civ. Action No. 12-

5

IPR2014-00247
Patent 7,724,879 B2

01688 (D. Del.).  Pet. 1.  The '879 patent was also the subject of *Level 3 Communications, LLC v. AIP Acquisition LLC*, IPR2013-00296 (PTAB), an *inter partes* review in which the Board found claims 1–15 unpatentable.

### D. Asserted Grounds of Unpatentability

The Board instituted *inter partes* review on the following asserted grounds of unpatentability under 35 U.S.C. § 103(a) (Dec. on Inst. 33–34):

| References | Basis | Claim(s) Under Review |
|---|---|---|
| Weinstein[3] and RFC1190[4] | § 103(a) | 1–8, 12, and 15 |
| Weinstein, RFC1190, and ISI[5] | § 103(a) | 14 |

## II. ANALYSIS

### A. Claim Construction

In an *inter partes* review, claim terms of an expired patent are given their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art, at the time of the invention, in light of the language of the claims, the specification, and the prosecution history of record.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313–1317 (Fed. Cir. 2005) (en banc).  However, there still is no presumption of validity, Petitioner's

---

[3] Clifford J. Weinstein and James W. Forgie, *Experience with Speech Communication in Packet Networks*, IEEE J. ON SELECTED AREAS IN COMMC'NS, SPECIAL ISSUE ON PACKET SWITCHED VOICE AND DATA COMMC'NS, vol. SAC-1, no. 6, 963–980 (1983) (Ex. 1010) ("Weinstein").
[4] Request for Comments 1190, "Experimental Internet Stream Protocol, Version 2 (ST-II)," C. Toplocic ed. (1990) (Ex. 1011) ("RFC1190").
[5] Univ. of S. Cal. Info. Scis. Inst., "1982 Annual Technical Report: A Research Program in Computer Technology," Report No. ISI/SR-83-23, Chapter 7 (March 1983) (Ex. 10014) ("ISI").

6

IPR2014-00247
Patent 7,724,879 B2

burden of proof is still by a preponderance of the evidence, and we do not apply a rule of construction with an aim to preserve the validity of claims. Moreover, a "claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). Any special definition for a claim term must be set forth in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). In the absence of such a special definition or other consideration, "limitations are not to be read into the claims from the specification." *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

In this proceeding, we provided a preliminary construction of "an internet protocol," "signaling messages," and "wherein the transmission comprises execution of a call setup procedure," using a broadest reasonable interpretation. Dec. on Inst. 10–17. We requested briefing by the parties with respect to what the proper construction of the disputed terms would be once the '879 patent expired. Paper 17. Upon reviewing the briefs submitted by the parties (*see* Papers 18, 19), we found that our preliminary construction of those terms did not change when applying a rule of construction similar to that used by district courts. Paper 20, 3. At oral argument, both parties acknowledged that only the construction of "internet protocol" affects the issues in this case. Hr'g Tr. 25:24–26:2, 36:17–22. Therefore, "internet protocol" is the only term for which we provide an express construction in this Decision.

Our preliminary construction of "internet protocol" was "a set of rules, instructions, or procedures relating to the format and timing of data

7

IPR2014-00247
Patent 7,724,879 B2

transmissions between two devices over the Internet, such as TCP/IP,"
which does not encompass ATM and frame relay protocols.  Dec. on Inst.
16.  Petitioner argues that the Board's preliminary construction of "internet
protocol" set out in the Decision on Institution is the correct construction.
Pet. Reply 3–5.  Patent Owner argues in its Patent Owner Response that the
preliminary construction should be limited further as follows (proposed
changes underlined): a set of <u>conventional</u> rules, instructions, or procedures
relating to the format and timing of data transmissions between two devices
over the Internet, such as TCP/IP, where internet protocols do not include
ATM and frame relay protocols <u>or their equivalents</u>.  PO Resp. 10–12.
However, at oral hearing, Patent Owner withdrew its contention that the
term "conventional" should be included in the construction of "internet
protocol."  Hr'g Tr. 50:11–17.  Essentially, Patent Owner desires to narrow
the construction such that it also excludes "equivalents" of ATM and frame
relay protocol.

    Claim 1 recites converting a transmission from a first format to a
second format, the second format being an "internet protocol."  The '879
patent does not define expressly the term "internet protocol," but states the
following:

> Both servers 60, 62 are networked *using transmission control
> protocol/Internet protocol TCP/IP, which is a set of protocols
> that link dissimilar computers across a variety of other
> networks and protocols as conventionally used on local area
> networks, minicomputers and mainframes*, or are networked
> with a router in the case of an ATM.

Ex. 1001, 7:45–50 (emphasis added).  That section of the Specification,
however, refers specifically to "transmission control protocol/Internet

IPR2014-00247
Patent 7,724,879 B2

protocol TCP/IP." The prior paragraph of the '879 patent includes the following sentence:

> The Internet network differs from frame relay switching and asynchronous transfer mode by using internet protocols such as transmission control protocol/Internet protocol (TCP/IP), which is a set of protocols developed by the Department of Defense to link dissimilar computers across a variety of other networks and protocols.

Ex. 1001, 7:34–39. Other than the recitation in claim 1, that sentence quoted above is the only reference in the '879 patent to "internet protocol," with a lowercase "i" and a lowercase "p." That sentence explains that TCP and IP are examples of "internet protocols," and that TCP/IP is a specific set of protocols that links dissimilar computers across various networks and protocols. That sentence also explains that the Internet's use of internet protocols distinguishes the Internet network from frame relay switching and ATM networks. Patent Owner argues that, combined with the knowledge of a skilled artisan at the time of invention, that sentence supports a construction of "internet protocols" that excludes "equivalents" of ATM and frame relay protocols. PO Resp. 10–11.

Tanenbaum[6], which is contemporaneous with the invention of the '879 patent, states that there were two common styles of internetworking, "a connection-oriented concatenation of virtual circuit subnets, and a datagram internet style." Ex. 2009, 401–403. Therefore, Patent Owner urges us to adopt a construction of "internet protocol" that excludes "equivalents" to ATM and frame relay protocols, which Patent Owner argues includes all

---

[6] Andrew S. Tanenbaum, *Computer Networks*, 3rd Edition, PRENTICE-HALL (1986) (Ex. 2009) ("Tanenbaum").

9

IPR2014-00247
Patent 7,724,879 B2

protocols used in virtual circuit networks. *Id.* at 10–11; Hr'g Tr. 33:11–34:2.

We find, however, that this argument conflates networks with protocols. Although the '879 patent clearly distinguishes the Internet from ATM and frame relay switching networks, it does so by stating that the Internet uses internet protocols and ATM and frame relay switching do not. Based on the evidence presented, we do not find that an ordinarily skilled artisan would have understood internet protocols to exclude protocols that may be used with all virtual circuit networks or, more to the point, used to connect concatenated virtual circuit subnets. Additionally, as pointed out by Petitioner, nothing in the '879 patent mentions virtual circuit networks or protocols. *See* Pet. Reply 5–6. Although the '879 patent mentions ATM and frame relay switching networks and the fact that they do not use internet protocols, there is no discussion of the fact that ATM and frame relay switching are virtual circuit networks or what protocols ATM and frame relay switching use. Furthermore, the specification of the '879 patent provides no explanation or insight regarding what would be an equivalent to ATM or frame relay switching, such that adding "equivalents" to the construction of "internet protocol" would introduce ambiguity. Therefore, even if we were to exclude ATM and frame relay switching protocols "and their equivalents," we find no support for an understanding that all protocols used in virtual circuit networks would be equivalents to ATM and frame relay switching protocols.

The '879 patent makes no mention of whether internet protocols are limited to datagram networks or whether internet protocols also may be used in virtual circuit networks. We have found nothing, and neither Patent

10

IPR2014-00247
Patent 7,724,879 B2

Owner nor Petitioner has pointed to anything, in the '879 patent indicating
that the inventor expressed a definition for "internet protocol."  Therefore,
we construe "internet protocol" according to its ordinary and customary
meaning as would have been understood by an ordinarily skilled artisan at
the time of invention of the '879 patent.  To help us glean that meaning, we
look to the extrinsic evidence submitted by the parties.

According to Patent Owner, in 1996, internetworking was understood
to be the transmission of data through different networks, using either "'a
connection-oriented concatenation of virtual circuit subnets [or] a datagram
internet style.'"  Ex. 2013 ¶ 29 (quoting Ex. 2009, 401–403).  Weinstein
uses the terms "internet" and "internetwork" interchangeably.  *See* Ex. 1010
*passim*.  A "protocol" is "[a] specific set of rules, procedures or conventions
relating to the format and timing of data transmission between two devices."
NEWTON'S TELECOM DICTIONARY (11th ed. 1996) (Ex. 3001).

Patent Owner argues that "TCP/IP protocols were developed in [the]
1970s to handle data communication over internetworks as more and more
networks were connected to the ARPANET."  Ex. 2013 ¶ 38.  The evidence
submitted in this proceeding explains that internetworking is communicating
among dissimilar networks.  *See, e.g.*, Ex. 1010, 1 ("techniques have been
developed for internetwork communication, among dissimilar nets"); Hr'g
Tr. 45:19–23.  Tanenbaum explains that, for internetworks comprised of
concatenated virtual circuit networks, internetworking was accomplished
through the use of multiprotocol routers (or gateways) between disparate
virtual circuit networks.  Ex. 2009, 8–9.  The gateways convert the messages
between the different protocols used by the disparate networks.  *Id.* at 8.
Datagram networks similarly use gateways between disparate networks and

11

IPR2014-00247
Patent 7,724,879 B2

may translate protocols between networks. *Id.* at 9–10. Tanenbaum, however, explains that an alternate approach is to use "universal 'internet' packet[s]" that all routers would recognize and "designed to be carried through many networks," i.e., internet protocols. *Id.* at 10.

The extrinsic evidence of record, in combination with the statement in the '879 patent ("internet protocols such as transmission control protocol/Internet protocol (TCP/IP)"), indicates that the Internet is one example of internetworking and Internet Protocol is one example of "an internet protocol." *Id.*; Ex. 1001, 7:34–39. Accordingly, we construe an internet protocol to be "a specific set of rules, procedures, or conventions relating to the format and timing of data transmission between two devices on different networks." As discussed, the '879 patent states that the Internet differs from frame relay switching and ATM in that the Internet uses internet protocols, such as TCP/IP. Thus, the protocols used *within* ATM and frame relay switching networks are not internet protocols.

### B. Submitted Evidence

#### 1. Weinstein (Ex. 1010)

Weinstein is an article published in the December 1983 issue of IEEE Journal on Selected Areas in Communications. Weinstein describes research work sponsored by the United States' Defense Advanced Research Projects Agency ("DARPA") which began with experiments conducted over the Advanced Research Projects Agency Network ("ARPANET"). Ex. 1010, 1. The work continued as the ARPANET was connected to additional networks, including the wide-band packet satellite network (WB SATNET). *Id.* The relevant structural details of the interconnected

12

IPR2014-00247
Patent 7,724,879 B2

networks may be better understood by referencing Figure 9 of Weinstein,

which is reproduced below.



Figure 9 of Weinstein depicts a "[w]ide-band internetwork packet voice/data

system, with illustration of primary local area facilities at each site." *Id.* at

13.

In the lower left corner, Figure 9 depicts a telephone connected to a

switched telephone network. Figure 9 depicts three other separate networks

(i.e., a packet radio network, an exploratory data network, and a local cable

network), all of which are joined together, along with the switched telephone

network, via a wide-band satellite network. *Id.* at 13–15. Weinstein

discloses "significant benefits" for integrating voice with data including

potential cost savings, enhanced service, voice communications among users

on different types of networks, control flexibility, and secure voice

communications. *Id.* at 1.

13

IPR2014-00247
Patent 7,724,879 B2

Weinstein describes an Internet Stream Protocol ("ST") which allows the interconnection of these four networks over a packet-based satellite network. *Id.* at 12. In the case of the switched telephone network, the signals used in the telecommunications network are converted into the ST protocol by the internetwork voice/data gateway. *Id.* at 11. The converted ST signal can then be transmitted through the wideband satellite network. *Id.* at 12.

### 2. *RFC1190 (Ex. 1011)*

RFC1190 is a publication describing version two of the Internet Stream Protocol ("ST-II") which is a revised version of the ST protocol used in Weinstein. RFC1190 is intended to be easier to implement and supports a wider range of applications. Ex. 1011, Abstract. By way of introduction, RFC1190 explains that the motivation for the original ST protocol was that internet protocol ("IP") did not support voice applications. *Id.* at 7. RFC1190 states that ST "is an internet protocol at the same layer as IP" and "proved quite useful in several early experiments that involved voice conferences in the Internet." *Id.*

RFC1190 describes that portions of the Internet support ST-II and in areas where ST-II is not supported, the ST-II packets may be encapsulated in IP packets. *Id.* at 9. Encapsulating ST-II packets allows connections across Internet routers that do not support the ST protocol. *Id.* at 64. When encapsulating ST-II packets, performance on the Internet cannot be guaranteed. *Id.* at 65. However, Type-of-Service may be set to request specific service (e.g., low delay, high throughput, normal reliability). *Id.* at 64–65. Also, the Source Route Option may allow the originator of the data to pre-specify an explicit path to the target. *Id.* at 46.

14

IPR2014-00247
Patent 7,724,879 B2

### 3. ISI (Ex. 1014)

ISI is a report published in March 1983, a portion of which describes a wideband communication project that would transmit digitized voice over ARPANET. Ex. 1014, 9. Although the project concentrates on voice communication, the wideband communication project will work on integrated communication of several media, such as video. *Id.* The goal is to develop real-time multimedia teleconferencing using wideband packet-switched networks. *Id.* at 10. The report discusses the switch telephone network interface, which allows the telephone network to communicate with a packet voice system. *Id.* at 14, 16–18. The report also discusses experimentation with other media including facsimile. *Id.* at 22.

### C. Asserted Obviousness of Claims 1–8, 12, and 15 in View of Weinstein and RFC1190

The Board instituted trial on Petitioner's challenge of obviousness of claims 1–8, 12, and 15 over Weinstein and RFC1190. Dec. on Inst. 24–30. Petitioner asserts that Weinstein discloses all of the limitations of claims 1–8, 12, and 15. Pet. 14–16. Petitioner relies on RFC1190 for teaching that Weinstein's ST is an internet protocol and, further, that RFC1190 teaches a second version of ST (i.e., ST-II) that is an internet protocol. *Id.* at 16, 25–28. Weinstein discloses converting a signal from a switched telephone network to ST format, which is then transmitted over ARPANET and a wide-band satellite network. Petitioner asserts that a person of ordinary skill in the art during the 1994–1996 time frame would have considered ARPANET and the wide-band satellite network to constitute a portion of the Internet. *Id.* at 15 (citing Ex. 1008, 14–15; Ex. 1019, 57). Petitioner further

15

asserts that it would have been obvious to one of ordinary skill in the art to replace the ST protocol disclosed in Weinstein with the ST-II protocol disclosed in RFC1190 because ST-II was a revision to ST and provided benefits, such as ease of implementation, support for a wider range of applications, eliminating the need for an explicit Access Controller, simplifying traffic stream management, and providing robustness and recovery mechanisms. Pet. 16–17 (citing Ex. 1011, 8).

Petitioner argues that ST, described in Weinstein, is an internet protocol because "[t]he ST protocol is 'designed to be compatible with IP [Internet Protocol],' and 'operates at an internet level.'" Pet. 15 (quoting Ex. 1010, 966, 974). Weinstein explains that "[t]he lower level protocol, which has come to be named 'ST,' provides an efficient internet transport mechanism" and "operates at the same level in the protocol hierarchy as IP, the DoD standard internet protocol for datagram traffic." Ex. 1010, 4. Furthermore, Petitioner challenges claims 1–8, 12, and 15 as obvious in view of the combination of Weinstein and RFC1190. Petitioner asserts that, to the extent Weinstein's ST is not considered an internet protocol, ST-II, which is the successor protocol to ST disclosed by RFC1190, teaches an internet protocol. Pet. 14–18. Petitioner argues ST-II is merely a revised and updated version of ST and is an internet protocol for the same reasons that ST is an internet protocol. *Id.* at 14–16. Petitioner further argues ST-II is an internet protocol because RFC1190 explicitly "states that the revised '***ST is an internet protocol***.'" Pet. 16 (quoting Ex. 1011, 7). Finally, Petitioner argues RFC1190 teaches transmitting voice using an internet protocol because RFC1190 discloses encapsulating ST packets using

16

IPR2014-00247
Patent 7,724,879 B2

Internet Protocol, which the '879 patent identifies as an exemplary internet protocol. *Id.* at 16 (citing Ex. 1011, 64; Ex. 1001, 7:34–39).

Patent Owner acknowledges that internet protocols allow connection between two networks and that ST and ST-II provide a connection between two networks. Hr'g Tr. 45:19–46:1. Patent Owner explained that "[i]nternetworking requires the fact that you are going from one network to another . . . So to connect them is internetworking" and that, in order to connect two different types of networks, "the connections has to be the same, which is using NCP, NVP, so they can talk to each other." *Id.* at 45:8–18. Patent Owner concluded – "That's why the development of ST protocol." *Id.* at 45:18. Thus, Patent Owner does not contest that ST and ST-II connect two disparate networks and admits that, if virtual circuit protocols are not excluded from the construction of "internet protocol," ST-II is an internet protocol. *Id.* at 36:23–37:5, 68:16–18.

As discussed above with respect to the construction of "internet protocol," Patent Owner argues the proper construction of "internet protocol" would exclude all protocols used in virtual circuit networks.[7] PO Resp. 10–12. Patent Owner argues that Weinstein's ST and RFC1190's ST-II are not internet protocols because ST and ST-II are virtual circuit protocols.[8] *Id.* at 11–12, 15–17; Hr'g Tr. 33:11–34:2. Our construction of "internet protocol," however, does not exclude virtual circuit protocols.

---

[7] As discussed above, Patent Owner has withdrawn its contention that "internet protocol" should be limited to conventional protocols.
[8] Patent Owner's prior contention that ST-II is not an internet protocol due to its experimental status is not commensurate with our construction of "internet protocol," which is not limited to conventional protocols.

17

IPR2014-00247
Patent 7,724,879 B2

Therefore, based on our construction of "internet protocol" and the evidence submitted, Petitioner has established, by a preponderance of the evidence, that ST-II is an internet protocol. We do not reach the question of whether Petitioner has demonstrated, by a preponderance of the evidence, that ST is an internet protocol. Other than disputing the construction of "internet protocol," Patent Owner disputes only that a skilled artisan would have combined Weinstein with RFC1190. PO Resp. 12–26; *see* Hr'g Tr. 37:20–24.

Patent Owner asserts the combination of Weinstein and RFC1190 would not have been obvious for various reasons. PO Resp. 12–14, 17–26. Specifically, Patent Owner argues that there would have been no justification to "resurrect a defunct system" and upgrade it to use the experimental ST-II protocol at the time of invention of the '879 patent because the ARPANET, which formed the core of Weinstein, was shut down by 1990. *Id.* at 14. Thus, Patent Owner asserts that Weinstein was so flawed, there was no reason to upgrade it. *Id.* Patent Owner argues that encapsulating ST (presumably referring to version 2 or ST-II packets) in IP packets would be incompatible with Weinstein and violate Weinstein's system requirements. *Id.* at 19. Patent Owner asserts the combination of Weinstein and RFC1190 would not have been obvious because ST-II is not compatible with ST and because there are major differences between ST and ST-II. *Id.* at 21–22. Patent Owner rehashes its arguments regarding the combinability of Weinstein and RFC1190 and asserts that combining Weinstein and RFC1190, therefore, is impermissible hindsight. *Id.* at 23–24.

Petitioner has submitted evidence of the implementation of ST-II in various systems near the time of invention of the '879 patent. Ex. 1023, 1–

18

IPR2014-00247
Patent 7,724,879 B2

4; Ex. 1030, 4–6; Ex. 1034, 20–21.  Moreover, RFC1190 indicates clearly
that ST-II is a revised version of ST.  Ex. 1011, 1; *see* Pet. 16.  Petitioner
also argues a skilled artisan would have been motivated to upgrade
Weinstein's ST with RFC1190's ST-II because RFC1190 identifies various
improvements and benefits of ST-II over ST.  Pet. Reply 12 (citing Ex.
1011, 8).  Petitioner asserts that the shutdown of ARPANET neither erased
the knowledge and teachings conveyed by Weinstein nor led to shutting
down the entirety of Weinstein's disclosed system.  *Id.* at 13.  Petitioner
argues that a skilled artisan is not an automaton and asserts that a skilled
artisan would have been capable of the making the hardware upgrades
necessary when migrating from ST to ST-II.  *Id.* at 14.

We are persuaded by Petitioner's arguments that an ordinary skilled
artisan would have found it obvious to consider upgrading ST to ST-II, the
version available at the time of invention of the '879 patent.  As pointed out
by Petitioner, the fact that ARPANET no longer existed at the time of
invention of the '879 patent does not render all of the teachings of Weinstein
unavailable to the hypothetical person of ordinary skill in the art.  One
would not have needed to "resurrect" the defunct ARPANET to take
advantage of Weinstein's teachings regarding combining voice networks
with data networks.  Rather, one would have gleaned the knowledge
necessary to create a system using a data network to transport voice
communication as a bridge between conventional telephony networks.  We
also agree with Petitioner that the submitted evidence regarding other
internet engineers implementing systems adopting ST-II supports a
conclusion that a skilled artisan would have been capable of making the
necessary correlated changes to hardware in order to implement ST-II.

19

IPR2014-00247
Patent 7,724,879 B2

Finally, Patent Owner argues the references cited by Petitioner, including Weinstein, "show a long felt need for a packet voice system at least as early as 1976," but that Weinstein "failed to gain adoption by the industry" and "[s]ince then, no one developed an intelligent voice routing system that bridges incompatible telecommunication networks via a conventional data network that uses an internet protocol as recited in Claim 1 of the '879 Patent." Prelim. Resp. 25. Patent Owner further argues that there was a long-felt but unresolved need because Petitioner has not challenged the claims as anticipated. *Id.* Petitioner asserts Patent Owner has presented no evidence supporting its argument of secondary considerations. *Id.* at 14–15.

To show failure of others, the evidence must establish that others skilled in the art tried and failed to find a solution for the problem solved by the appellant. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1540 (Fed. Cir. 1983). Moreover, allegation of an unsolved problem in the art is not indicative of nonobviousness unless it is shown "that the *widespread* efforts of skilled workers having knowledge of the prior art had failed to find a solution to the problem." *In re Allen*, 324 F.2d 993, 997 (CCPA 1963) (emphasis added). Patent Owner presented no evidence of any actual attempts of others, which have failed. Additionally, Patent Owner asserts that feasibility was demonstrated by Weinstein, but that Weinstein failed to gain adoption and no other system was developed. Patent Owner, however, does not establish any reasons why Weinstein was not adopted, or other systems were not developed, that would show a failure to find a solution.

Thus, having reviewed the evidence of record, we are persuaded Petitioner has demonstrated by a preponderance of the evidence that

20

Weinstein and RFC1190 teach the limitations recited in claims 1–8, 12, and 15. Additionally, we are persuaded Petitioner has demonstrated by a preponderance of the evidence that it would have been obvious to a skilled artisan to upgrade ST to ST-II, thus teaching the elements as arranged in claims 1–8, 12, and 15. Therefore, we find that claims 1–8, 12, and 15 are unpatentable as obvious in view of Weinstein and RFC1190.

### D. Asserted Obviousness of Claim 14 in View of Weinstein, RFC1190, and ISI

The Board instituted trial on Petitioner's challenge of obviousness of claim 14 over Weinstein, RFC1190, and ISI. Dec. on Inst. 33. Claim 14 depends from claim 1 and further recites that the "transmission is related to a fax transmission." Petitioner relies on the same combination of Weinstein and RFC1190 for teaching the limitations common to claims 1 and 14. Petitioner asserts that ISI discloses the possibility of using wideband communication for facsimile transmissions. Pet. 50–51. Petitioner further asserts that it would have been obvious to combine Weinstein's network to send facsimiles as suggested by ISI, because Weinstein and ISI "describe inter-related research projects," and a skilled artisan would have looked to ISI "for further details regarding the systems described in Weinstein." *Id.* Moreover, Petitioner points to ISI's statement that packet switching "must also expand to support media which have not been accommodated in the past." *Id.* (quoting Ex. 1014, 13) (internal quotation marks omitted). Finally, Petitioner points to ISI, which describes "experimentation not only with several voice channels but also with other media, such as . . . facsimile." *Id.* (quoting Ex. 1014, 22) (internal quotations marks omitted).

IPR2014-00247
Patent 7,724,879 B2

In addition, Petitioner asserts that Weinstein describes channel capacity savings when using a packet-based system for transmitting voice and that one of ordinary skill in the art would have recognized that similar savings would occur when sending a facsimile because it is largely a one-sided communication. *Id.* at 51.

Patent Owner asserts that Petitioner has failed to show that claim 14 is obvious for the same reasons asserted with respect to claim 1. PO Resp. 26. Patent Owner does not dispute that ISI teaches the additional limitation of claim 14 or that it would have been obvious to combine ISI with Weinstein. *Id.*

We find Petitioner has demonstrated, by a preponderance of the evidence, that ISI teaches a "transmission is related to a fax transmission," as recited in claim 14, and that it would have been obvious to combine ISI with the proposed Weinstein-RFC1190 system. Therefore, we find that claim 14 is unpatentable as obvious in view of Weinstein, RFC1190, and ISI.

## III. CONCLUSION

Petitioner has demonstrated by a preponderance of the evidence that claims 1–8, 12, and 15 are unpatentable over Weinstein and RFC1190, and claim 14 is unpatentable over Weinstein, RFC1190, and ISI.

22

IPR2014-00247
Patent 7,724,879 B2

## IV. ORDER

In consideration of the foregoing, it is:

ORDERED that claims 1–8, 12, 14, and 15 of the '879 patent are held *unpatentable*; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the  notice and service requirements of 37 C.F.R. § 90.2.

23

IPR2014-00247
Patent 7,724,879 B2

For Petitioner:

David McCombs
John Russell Emerson
Theodore M. Foster
Thomas King
HAYNES AND BOONE, LLP
David.mccombs.ipr@haynesboone.com
russell.emerson.ipr@haynesboone.com
ipr.theo.foster@haynesboone.com
ipr.thomas.king@haynesboone.com

For Patent Owner:

Chi Eng
ENG LAW FIRM
chi@englaw.com

Alfred Froebrich
LUCAS & MERCANTI LLP
afroebrich@lmiplaw.com

24



US007724879B2

(12) **United States Patent**                    (10) **Patent No.:**        **US 7,724,879 B2**

Mashinsky                                         (45) **Date of Patent:**        *May 25, 2010

(54) **EFFICIENT COMMUNICATION THROUGH NETWORKS**

(75) Inventor: **Alexander Mashinsky**, New York, NY (US)

(73) Assignee: **Anip, Inc.**, Carson City, NV (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/895,460**

(22) Filed: **Aug. 24, 2007**

(65) **Prior Publication Data**

US 2008/0226054 A1      Sep. 18, 2008

**Related U.S. Application Data**

(63) Continuation of application No. 10/941,471, filed on Sep. 15, 2004, now Pat. No. 7,269,247, which is a continuation of application No. 09/551,189, filed on Apr. 17, 2000, now abandoned, which is a continuation of application No. 08/727,681, filed on Oct. 8, 1996, now Pat. No. 6,188,756, which is a continuation-in-part of application No. 08/320,269, filed on Oct. 11, 1994, now abandoned.

(30) **Foreign Application Priority Data**

Oct. 11, 1995    (IL) ..................................... 115580

(51) **Int. Cl.**
*H04M 11/06*        (2006.01)

(52) **U.S. Cl.** ................... 379/88.14; 340/7.21; 370/354; 379/142.04; 705/65

(58) **Field of Classification Search** ................. 370/354, 370/329, 335, 407, 506, 524; 340/7.21; 379/88.14, 379/88.01, 88.13, 142.04; 348/14.1; 358/440; 375/377; 455/430; 703/27; 710/105; 705/65
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,644,351 A * | 2/1987 | Zabarsky et al. ........... 340/7.21 |
| 5,027,387 A | 6/1991 | Moll |
| 5,042,027 A | 8/1991 | Takase et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

JP        07 131486        5/1995

OTHER PUBLICATIONS

C. Yang, RFC 1789—INETPhone: Telephone Services and Servers on Internet, University of North Texas, Apr. 1995, pp. 1-6.

*Primary Examiner*—Gerald Gauthier
(74) *Attorney, Agent, or Firm*—Cohen Pontani Lieberman & Pavane LLP

(57)        **ABSTRACT**

A method and device that interrogates the availability of a called party before placing a communication from the calling party to the called party. A callback may be initiated so that both communications are completed simultaneously. The routing of communication may take place through any one of a number of different networks and at another time of the day, even if the caller does not otherwise have access to those networks.

**15 Claims, 8 Drawing Sheets**



**US 7,724,879 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,287,202 | A * | 2/1994 | Kumarappan ............... 358/440 |
| 5,406,557 | A * | 4/1995 | Baudoin ...................... 370/407 |
| 5,412,760 | A * | 5/1995 | Peitz .......................... 370/329 |
| 5,426,643 | A * | 6/1995 | Smolinske et al. .......... 370/506 |
| 5,434,854 | A * | 7/1995 | Focarile et al. ............. 370/335 |
| 5,444,713 | A * | 8/1995 | Backaus et al. ............. 370/524 |
| 5,502,752 | A * | 3/1996 | Averbuch et al. ............ 375/377 |
| 5,511,111 | A * | 4/1996 | Serbetcioglu et al. ..... 379/88.01 |
| 5,526,404 | A * | 6/1996 | Wiedeman et al. .......... 455/430 |
| 5,534,914 | A * | 7/1996 | Flohr et al. ................ 348/14.1 |
| 5,553,271 | A * | 9/1996 | Hile et al. ..................... 703/27 |
| 5,617,423 | A | 4/1997 | Li et al. |
| 5,699,089 | A | 12/1997 | Murray |
| 5,724,406 | A * | 3/1998 | Juster ...................... 379/88.13 |
| 5,726,984 | A | 3/1998 | Kubler et al. |
| 5,742,905 | A | 4/1998 | Pepe et al. |
| 5,859,984 | A * | 1/1999 | Blair et al. ................... 710/105 |
| 5,999,598 | A | 12/1999 | Henrick et al. |
| 6,104,711 | A | 8/2000 | Voit |
| 6,108,704 | A | 8/2000 | Hutton et al. |
| 6,128,304 | A | 10/2000 | Gardell et al. |
| 6,137,869 | A | 10/2000 | Voit et al. |
| 6,243,373 | B1 | 6/2001 | Turock |
| 6,282,574 | B1 | 8/2001 | Voit |
| 6,298,062 | B1 | 10/2001 | Gardell et al. |
| 6,359,880 | B1 | 3/2002 | Curry et al. |
| 6,430,275 | B1 | 8/2002 | Voit et al. |
| 7,269,247 | B2 * | 9/2007 | Mashinsky ............... 379/88.14 |
| 7,454,000 | B1 * | 11/2008 | Henderson ............. 379/142.04 |
| 2006/0190412 | A1 * | 8/2006 | Ostroff ....................... 705/65 |

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5

GET FIRST LEG COUNTRY_CITY DESTINATION
120
GET SECOND LEG COUNTRY_CITY DESTINATION
122
LOOK UP IN STAT_CALL_BACK TABLE FOR LEAST ESTIMATED CONNECTION TIME
124
CALCULATE DIFF BETWEEN LEG_1 AND LEG_2 CONNECTION TIMES
126
DIAL TO LEG WITH LONGER CONNECTION TIME NEEDED
128
SET TIMER TO DIFF
130
CONNECT
132
IF TIMER=0
NO
YES
DIAL TO LEG WITH SHORTER CONNECTION TIME
134
ESTABLISH CALL
136

FIG. 6

FIG.7A 

FIG. 7B 

FIG. 7C 

FIG. 7D

FIG. 7E 

FIG. 7F 

FIG. 7G 



ACCESS DEVICES
INTERCEPT
INTERCEPT
INTERCEPT
DIGITAL AND ANALOG TELEPHONE NETWORK
PAGING AND CELLULAR NETWORK
DATA NETWORK
SUBSCRIBER ACCESS DEVICE INTERFACE
AUTHORIZER
AUTHORIZER
AUTHORIZER
CENTRAL LOCAL NODE A
CONVERTER TECHNOLOGY A
CONVERTER TECHNOLOGY B
CONVERTER TECHNOLOGY C
COMPRESSION AND CODING
DECOMPRESSION AND DECODING
MAIN PROCESSOR AND ROUTER
MAIN DATA BASE
CONVERTER TECHNOLOGY D
CONVERTER TECHNOLOGY E
CONVERTER TECHNOLOGY F
AUTHORIZER
AUTHORIZER
AUTHORIZER
OTHER NODE DATA BASES
INTERNET TCP/TP
FRAME RELAY AND ATM
DIGITAL AND ANALOG VOICE LINES
GLOBAL NETWORK OF HIGH CAPACITY DATA NETWORKS
CENTRAL LOCAL NODE B
CENTRAL LOCAL NODE C
INTERCEPT
INTERCEPT
INTERCEPT
ACCESS DEVICES

FIG. 8

FIG. 9

US 7,724,879 B2

**1**

# EFFICIENT COMMUNICATION THROUGH NETWORKS

## CROSS REFERENCE TO RELATED APPLICATIONS

This is a continuation of U.S. patent application Ser. No. 10/941,471, filed Sep. 15, 2004 now U.S. Pat. No. 7,269,247, which is a continuation of U.S. patent application Ser. No. 09/551,189, filed Apr. 17, 2000 now abandoned, which is a continuation of U.S. patent application Ser. No. 08/727,681, filed Oct. 8, 1996, issued as U.S. Pat. No. 6,188,756, which is a continuation-in-part of U.S. patent application Ser. No. 08/320,269, filed Oct. 11, 1994, now abandoned.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a system for providing transparent access to different types of communication networks that may be incompatible with each other and some of which may be incompatible; with the equipment used by the calling party or the called party, least cost routing in such a system, maintaining quality of communication in such a system, prioritizing the routing of such communications, evaluating different communication access locations to determine where to send a communication, synchronizing communications, blocking incoming communications while waiting for the synchronizing to be completed, and minimizing the cost of communications using such a system. This system also monitors and records the services used on each of the unrelated service providers. This information is then utilized for billing purposes and for paying the service providers.

2. Description of the Related Art

Presently when communication services are offered on a global basis, communications are established through the equipment of a plurality of service providers located in various countries. This communication is dominated by large carriers which have formed the global network through reciprocal agreements. Smaller competing carriers, who may offer the same service at lower prices, currently do not have reciprocal agreements between them.

The invention provides these smaller competing carriers with access to each other without the use of the large carriers. Such access provides the calling party (e.g., a subscriber of the smaller competing carrier) with the option of obtaining optimum service at lower prices while ensuring that the appropriate service providers get paid. The calling party can now have cheaper access to different types of telecommunication networks that the party may not have access to under the current large carrier system. It may be cheaper or preferred for the calling party to use smaller carriers to communicate with another location by routing the communication over a digital data network rather than an analog voice network, or by routing the communication over a paging network rather than a cellular network or a combination of networks.

## SUMMARY OF THE INVENTION

One objective of the invention is to provide communication between otherwise incompatible communication networks in a manner that is transparent to the calling party (that is, the subscriber of the service initiating the communication), while assuring that each service provider that renders service in routing that communication gets paid. Preferably, the communication is routed based on the results from an evaluation

**2**

of all available communication networks even though the calling party may have direct access to only one type of communication network.

In accordance with the invention, control information in the form of an inquiry of the availability status of the party to be called may be sent through different networks by routing it through a control location of the inventive system that converts it into a compatible form. For instance, the called party may be using one type of network, such as a data network having E-mail, while the calling party is using another, such as a cellular network

With a conventional data network, sending an E-mail message to an address on the data network does not indicate the availability of a party on a cellular network to communicate. In accordance with one embodiment of the invention, however, the control location of the inventive system is connected with both the data network and the cellular network to convert the control information associated with E-mail into a form compatible on the cellular network for making an inquiry and then transmits the inquiry over the cellular network.

The inventive system may have external or internal software and hardware that intercepts the normal transmission to route it appropriately. The system effects further routing, which may include converting between different forms of communication networks, compressing voice into data packets or decompressing data packets into voice, coding and decoding transmissions for security reasons, and multiplexing communications over the same lines. The system records the various routing transactions involved in the communication and calculates the billing of the transactions in a manner that is transparent to the calling party.

Another objective of the invention is to interrogate the called party number's communication availability prior to conferencing the calling party and called party. The inventive system may have a control location that receives both a calling party and a called party access number or identification. After receiving these access numbers, the system initiates an inquiry to the called party from the control location and waits for a status signal as to the called party location's availability to take incoming calls. If the status signal indicates an available status, a first communication is initiated to the called party access number from the control location and a second communication is initiated to the calling party access number from the control location. Thereafter, the first and second communications are bridged using the same or different networks.

In addition to interrogating the called party's availability status, the control location determines where to route the call by examining factors such as transmission cost, the appropriate network for the desired transmission, the service provider that provides this kind of network and the plurality of available called party locations that service the called party access number. The control location also considers communication networks that are available to the called party locations and the identity of service providers who provide those communication networks across the various called party locations. After receiving the calling party and called party access numbers, the control location performs an inquiry as to which service provider and which network can route the transmission.

In addition to technological considerations, the control location also studies the various cost to perform the desired transmission and records such information for both monitoring and billing purposes. An authorizer uses such information to monitor all incoming and outgoing transactions between

US 7,724,879 B2

**3**

the network service providers and provide clearance insuring payment and settlement of all transaction for each of these operators.

In routing communications, the control location takes into consideration customer defined preference criteria relating to preferences for particular types of communication network, transmission quality, cost, security, and priority of transmission. For example, if the quality of a transmission is not acceptable, the transmissions may be rerouted to any other available network that can transmit with better quality, thereby ensuring that the quality of the transmission satisfies the customer's preference criteria for transmission quality. The calling party access number itself may include a message or protocol containing preference criteria selections.

Another objective of the invention involves synchronizing the completion of callback from the control location to the calling party and called party legs of communication. The synchronization involves the calculation of the waiting time that is necessary before the control location commences each callback. The waiting time may be fixed or read from memory off a data base located at the control location. This synchronization may result in completion of both communications simultaneously or with minimal delay, i.e., a significantly shorter delay than without the synchronization. Such synchronization results in more efficient use of the network at a lower cost.

While the control location is waiting to initiate completion of one of the callback legs of communication, an incoming communication may block the completion of that one leg and thereby interrupt the synchronization from taking place. The blocking period may be for a fixed time period or may be based on information in a data base that includes information relating to the expected waiting time for completing communications.

In accordance with all embodiments of the invention, the communication being established may be two-way.

Other objects and features of the present invention will become apparent from the following detailed description considered in conjunction with the accompanying drawings. It is to be understood, however, that the drawings are designed solely for purposes of illustration and not as a definition of the limits of the invention, for which reference should be made to the appended claims. It should be further understood that the drawings are not necessarily drawn to scale and that, unless otherwise indicated, they are merely intended to conceptually illustrate the structures and procedures described herein.

BRIEF DESCRIPTION OF THE DRAWINGS

For a better understanding of the present invention, reference is made to the following description and accompanying drawing, while the scope of the invention is set forth in the appended claims.

FIG. **1** is a conceptual block diagram indicating the principles of operation of the inventive method to interrogate over a data network and transmit voice over the data network.

FIG. **2** is a schematic diagram of a system overview having two servers at nodes connected to an Internet backbone.

FIG. **3** is a schematic diagram of a telephony server.

FIG. **4** is a functional block diagram of the embodiment of FIG. **2**.

FIG. **5** is a schematic diagram of a flow chart showing routing for versatility and priority of transmission.

FIG. **6** is a schematic diagram of a flow chart showing synchronizing connection.

FIGS. **7A-7G** are schematic diagrams showing different types of communication routing techniques.

**4**

FIG. **8** is a schematic representation of a central local node interacting with networks in accordance with the invention.

FIG. **9** is a conceptual block diagram that is a further variation of that of FIG. **1**.

DETAILED DESCRIPTION OF THE PRESENTLY PREFERRED EMBODIMENTS

Turning to FIG. **1**, a schematic drawing depicting a method of sending a voice or digital transmission to a local node is shown. For ease in understanding, this drawing is the same as FIG. 1 of the copending U.S. patent application Ser. No. 08/320,269 (the '269 application), filed Oct. 11, 1994 by the present inventor and entitled METHOD OF AND SYSTEM FOR EFFICIENT USE OF TELECOMMUNICATION NETWORKS (as amended), whose contents are incorporated herein by reference.

The '269 application describes a technique by which hotels, and other similarly situated establishments, can make use of international callback technology. The reference numbers in FIG. 1 of the '269 application are the same as those in FIG. **1** of the present application, i.e., a telecommunications network **10**, calling location **12**, called location **14**, transparent telecommunications node or intercept **16**, first central local node **18**, data network **20**, central office **22**, second central local node **24**, phonecall **26**, link **28** to central local node **18**, link **30** to the external channel **20**, link **32** to the second central local node **24**, line **36** over which a first phonecall **27** is made to interrogate the called location **14** and over which is sent back a call supervision status signal **38**, a callback **40**, an uncompleted call signal **42**, a message **44**, a reverse answer supervision signal **47** and a calling location **48** that places a call **50**A or receives a callback **52**A.

The calling location **12** may be where a data transmission originates or where a voice communication originates for eventual receipt by the calling location **14**. While phonecalls are certainly one form of communication envisioned, the invention covers any type of communication, whether it involves public service telephone networks, cellular networks, paging networks, data networks, analog networks, etc. A call is to be interpreted as any form of communication over a network and not limited just to voice phonecalls.

While such a technique is particularly suited to callback situations that employ a voice network, it is also applicable to employing digital data based networks such as the internet computer network For instance, instead of routing a call direct between locations A and B using technology X, it may be cheaper to use callbacks from location C to location A and from location C to location B using technology Y.

As used in this application, the term "calling party" designates the initiator of the transmission or communication, which may include callers over phone networks, subscribers that use data, cellular or paging networks, etc. The term "called party" designates the ultimate receiver of the transmission or communication from the calling party and with whom communication is being effected. The called party may include users of phone networks, cellular networks, paging networks, data networks, etc. whose access device on the network serve as the destination to which the transmission or communication is directed from the calling party.

In addition to transmitting voice through the telecommunication network **10**, the voice may be converted into digital form in a conventional manner, e.g., compressed into data packets or sampled. At the first central local node **18**, the call from the calling location **12** is converted to a data signal which is then sent over a data network such as the data network **20** to the called location or destination **14**. Prior to

5

reaching the called party, the data signal is reconverted into voice at the central office **22** (or control location) to be transmitted to the destination **14** via a public communications network or other connection line **36**. Such a transaction bypasses the use of the international telephone networks and utilizes local calls instead. All internode connections are via the data network.

In addition, by transmitting voice over a data network, the need for callback over a telephone network to save costs is obviated. Since data transmissions are virtually instantaneous, the costs associated with the waiting times for transmitting voice over conventional phone networks is avoided and even the costs associated with making waiting times for making connection in a callback over a conventional phone network are avoided.

Each node is capable of communicating with other nodes for purposes of routing the communication and act as a transit node, making inquiries to determine availability of the party at the destination to receive the communication, and even tracking down which network the party is presently accessing so that the communication may be routed there. For instance, a node at the called party may be preprogrammed with all different forms of communication networks and contact identifications that the party may be accessing, together with their addresses, access numbers, or other types of identification information to access them from the node.

Upon receipt of a request inquiring as to the availability of the party to receive a communication, the node at the called party having the main identification or number associated with the called party checks the status of each of these communication networks at different access locations to determine whether any are being accessed by the party at that time. In this connection, the called party would have previously designated the main identifications (addresses, etc.) or phone numbers where it wants to be reached and what networks are to be employed.

For instance, the check may reveal that the called party's computer is logged in or that the phone is hooked up, etc. If so, then the node has identified where the party may be accessed and then contacts the inquiring node to forward an authorization code for billing credit purposes so that the called party node may effect communication through this identified communication network. The authorization code limits the duration and services that may be provided. Alternatively, the system may send the authorization code together with the inquiry.

The node that made the inquiry request sends the authorization code after checking in with a central node responsible for clearing all transactions and which registers every event on the network. The central node may be part of a distributed network of central nodes that are responsible for billing. After the called party node receives the authorization code and authenticates it for billing purposes, communication may be established to the party through the identified communication network that was tracked down and found to be accessible all transparent to the end user. An appropriate signal is transmitted to the requesting node that communication may commence between the parties.

An example of tracking down the called party will now be described. Assume that the party spends half the year in North America using NACN cellular network and the remainder in Europe using GSM internet network hookup using Laptop computer. Under normal situations, these two forms of networks are not compatible so direct communication is not possible. However, in accordance with the invention, such a situation is rectified by communicating with a node that is programmed with information as to which of the possible

6

networks the party may be using. If the node is in contact with the NACN system, it is also in contact with a node that is in contact with the GSM system Both nodes check their respective cellular systems to locate on which the party is or has been accessing or which has been turned off. Once the accessible location is identified, contact can be made from regular telephone to the laptop converting and routing the voice over data to the laptop on which it is converted back into voice.

As an example of operation, the subscriber of the service provider first contacts a central local node by providing the calling party's identity access number or identification and the called party access number or identification, as well as the type of service desired as concerns routing preferences, service providers, level of transmission quality, timing of transmission, etc.

The central local node polls the called party nodes to locate the network which the called party is accessing. For instance, one called party node may be programmed with access information on all the possible networks that the called party may be using, e.g., cellular, computer, paging, etc. This called party node then searches to find where the called party is or is likely to be and then informs the central local node that the communication may be sent to it upon receipt of an authorization number for the transaction.

The central local node provides such authorization, perhaps after checking with the central node first that handles billing and determining that the calling party or service providers satisfy financial conditions for permitting service and future settlement. If the central local nodes do a least cost routing analysis, for instance, and determine that a callback from the called party is the cheaper way to complete the transaction and both the calling party's service provider and called party's service provider has received authorization, then the originating service provider will be billed. The central node records all such transactions for billing purposes.

One application of the invention that allows the Internet or other data network to function like a telephone and fax machine will now be explained. Callers are allowed to dial anywhere in the world for the price of a local access and service fee and avoid using long distance carriers. Users may make such calls to have voice conversations and to send faxes to remote locations. For making voice calls, a local system is dialed via computer access or regular phone which prompts the users for the called party number or identification and then connects them to the called party over the Internet or other data network, such as by connecting them via a node through a local call or through other networks. For example, a calling party may access a node that converts the transmission into data to support the network that it chooses. For instance, it may connect to another node that converts the transmission into voice and then connects the communication into a local call to the called party with the called party node being operated by an independent service provider located elsewhere such as in another country. Of course, the connection takes place only after authorization is received to complete the local call.

For sending faxes, the calling party sends a fax into a central local node and the fax is then forwarded to the called party over the Internet or other data network. The fax may be sent in real time or as a store and a forward mode for later sending as part of a subsequent batch transmission, depending upon the preferences of the calling party.

The present invention envisions the option of using a single communication device, such as a multimedia laptop computer, to initiate and receive all forms of communication by contacting a node or being contacted by a node in accordance with the invention and providing it with an identification

US 7,724,879 B2

7

access address and a called party access address, phone number or other type of identity code and any preferences concerning the transmission, such as level of quality of transmission, service providers, time of cost, transmission (e.g., real time or store and forward later), security, encryption, etc.

Transparent to the calling party that is using the laptop, the node takes care of all further action such as tracking down the called party, handling financial billing and obtaining authorization for completing transactions via individual remote service providers, determining the preferred path to route communications even if over otherwise incompatible networks by converting the transmissions accordingly, checking the level of quality of transmission and making sure the transmission satisfies preferences.

In addition to having access to a data network, the laptop may have appropriate software/hardware that give it access to a cellular digital packet data and, via a built-in fax modem, to a phone network. Thus, the laptop may be in contact with the node through any of these different communication networks and communicate over any of these communication networks as well, including performing two way voice calls.

Other applications of the invention concern transmissions through conventional switched frame relay, conventional switched asynchronous transfer mode and other conventional data networks such as the Internet. Frame relay is an international standard for efficiently handling high-speed data over wide area networks that uses network bandwidth only when there is traffic to send. Asynchronous transfer mode allows users to combine voice, video and data on a single phone line and operates at up to Gigabyte-per-second speeds in which usable capacity is segmented into fixed-size cells each consisting of header and information fields allocated to services on demand. The Internet switching differs from frame relay switching and asynchronous transfer mode by using internet protocols such as transmission control protocol/Internet protocol (TCP/IP), which is a set of protocols developed by the Department of Defense to link dissimilar computers across a variety of other networks and protocols.

Referring to FIG. 2, several remote nodes 50, 52, 54 are shown on the Internet backbone 56. Each remote node has a telephone server 60 and an Internet server 62, although a common server may be used instead to provide both functions. The Internet server 62 has access to the Internet backbone 56. Both servers 60, 62 are networked using transmission control protocol/Internet protocol TCP/IP, which is a set of protocols that link dissimilar computers across a variety of other networks and protocols as conventionally used on local area networks, minicomputers and mainframes, or are networked with a router in the case of an ATM. Subscribers 64 dial into and are serviced by the telephone server 60, which is a computer based machine with conventional voice and fax processing hardware and software, so as to establish a connection with one of the remote nodes. Subscribers access the servers by using any of the conventional off-the-shelf phone and fax machines.

Referring to FIG. 3, a calling party interface 70, operator interface 72 and a public switched telephone network PSTN interface 74 are shown. The subscriber interface 70 provides subscribers or calling parties with internet phone and fax service via the Internet is Server 62 of the remote nodes (see FIG. 2). The calling party may dial into the subscriber interface 70 through voice or data lines, for instance, with a computer or laptop. The PSTN interface 74 has lines that are used for inbound calls and lines that are used for outbound calls. These lines for inbound calls lead to industry standard dialogic hardware or a modem such that when a particular number is called, the identification or password of the calling party is checked for validity of identity.

8

If determined to be valid, the calling party is requested to indicate what service is desired so that the communication may be routed accordingly over voice or data networks. The called party is contacted to determine availability for receiving the communication. If available, communication is established over the desired service. Otherwise, if real time communication is desired, the calling party is notified that contact is unavailable.

If store and forward is the desired method of communication, then the called party is monitored until contact becomes available, at which time the communication may be transmitted. A store and forward type communication is one in which a desired communication, such as a telecopier transmission, is stored until it may be sent in accordance with other criteria, such as in batch format at off peak rates.

Voice processing entails call processing and content processing. Call processing involves physically moving the call around such as through switching. Content processing involves actually interacting with the call's content, such as digitizing, storing, recognizing, compressing, multiplexing, editing or using it as input to a computer program.

The operator interface 72 includes designated representatives of the service provider to interact with the system by means of a personal computer console to perform essential functions such as subscriber administration, rate schedule management, billing and system administration. These functions are remotely accessible by dial up.

FIG. 4 shows the functional hardware in accordance with the invention. In addition to the previously mentioned fundamental external interfaces, the internal functional blocks that are necessary for the present invention include, as represented by blocks in the diagram, a data base 76, call management 78, switching, voice and fax messaging 80. The horizontal links 82 on either side of the switching and voice messaging block 80 are voice paths. The remaining links 84 are all data flow paths.

The data base 76 is a database management system that is used as a repository for subscriber information, rate schedules, call details, and configuration information required to operate the system and the franchise. Switching via block 80 is required to establish voice or fax between the source and the called party. Pre-recorded audio messages are played back onto a voice pathway by voice messaging for purposes of greeting, indicating normal call setup progress, and checking system load status, subscriber account status, and error calculations. Voice messaging refers to a small set of system wide messages and not to arbitrary voice mail messages.

Calls originating from the PSTN interface side are detected by the switching voice messaging block 80, which also communicates with call management 78 to establish a link with the called party node via the Internet server 62 of FIG. 2 or a voice or data line and to determine which message to playback if any. The call management 78 handles call set up requests from either the subscriber interface 70 side or PSTN interface 74 side to issue call set up commands to the subscriber interface 70 and to the switching voice messaging 80. It maintains status information on the subscriber interface and PSTN lines. The call management 78 is configurable to verify credit availability before setting up a call with other nodes if necessary, and monitor the call to issue voice messaging and call termination commands upon credit depletion. It handles call take down situations by recording call detail information in the database for eventual billing purposes and issuing relevant commands directly to subscriber interface 70.

Case: 15-1965    Document: 14    Page: 119    Filed: 11/02/2015

US 7,724,879 B2

**9**

For establishing a call, the following steps may take place:

The dialogic hardware answers the call. The switching voice messaging **80** sends a message to the answered call via the voice processing unit requesting entry of a called party access number, which after its entry is received and stored. The call management **78** checks the data base **76** for the user's billing status. If invalid, the voice processing unit plays a message and the call is disconnected. Otherwise, for valid callers, the call management **78** initiates the subscriber interface **70** to send a request packet over the Internet other data or voice line; the request packet consists of the called party number or identification and may include an authorization code.

Upon receipt of the packet at a remote central local node, the remote central local node will dial the called party number or enter its address, perform a call analysis and send the result back to the subscriber interface at the origination node. Call management **78** checks the analysis result. If a connection link was established, then the call begins. Otherwise, the switching voice messaging **80** prompts the user via the voice processing unit with a message and options, such as dial another number or leave a message in a voice mailbox. Upon completion of the call, billing information will be stored in the data base **76** for further processing by the operator interface **72**.

FIG. **5** illustrates a technique for gaining access to a greater number of telecommunication networks. The normal transmission from an access device is intercepted by an intercept device, which routes the transmission to a central local node. At the central local node, an investigation is made as to what route is available for the specific service.

After determining which route is available, the central local node determines all available nodes that can provide such a service for the called party end. The central local node then selects a specific available node based on considerations such as cost, line quality and security and priority. The central local node checks with an internal data base to determine the available networks at the called party end, the identity of the service providers who provide those networks across different nodes, and the different transmission costs associated with customer defined criteria. The network access devices supported at the called party end could be a telecopier, telex, voice telephone, cellular phone, radio phone, data entry terminal, etc. (different types of communication access devices). Transmission costs associated with customer defined criteria include customer preference for particular types of networks, encryption security, and/or priority of transmission such as transmit in real time or in a store and forward format as defined in the customer's message.

A software defined network may be used to maintain quality (e.g., upon detection of degradation in quality, the bandwidth of the transmission may be widened in accordance with or prioritization of transmission instructions). If data packets do not arrive quick enough, then quality may be enhanced by increasing the bandwidth within predetermined bandwidth parameters on account of other voice data users.

Another embodiment of the application of this invention concerns security. A calling party may prefer that the transmission take place over a secure, dedicated line, but does not is care about the route taken by the acknowledgment or reply to the transmission. As a result, the acknowledgement or reply may be routing over non-dedicated lines and through any communication networks, even from among selected networks of the calling party's choosing. For instance, the calling party may want the acknowledgement or reply to be routed over either cellular or computer network services.

**10**

In accordance with the invention, such customer preferences may be found in the data base associated with the calling party and interpreted by the central local nodes. The central local nodes then instruct nodes responsible for the routing back of the reply or acknowledgement to follow the desired preference.

Another example of the application of this invention relates to a customer's preference that a telecopier message be transmitted immediately instead of in delayed batch format or vice versa. The telecopier message is sent to a central local node (at the origin). After initializing the system, i.e., setting a carrier default **90**, checking customer preferences for an operator of a service provider **92** and checking customer preference for selecting the desired service **94**, the central local node determines **96** if there are any more central local nodes (CLN) from a least cost routing (LCR) table, which contains a list of central local nodes connected with service providers of different networks and their costs for providing service.

If there are more central local nodes, the next one is selected **98**. A determination **100** is made as to whether peak or off peak rates apply by basing it on the current time. Reference to a data base table **102** may be made to determine the average call length of service to the location by the customer to help figure out the most efficient route based on history of usage. A least cost routing comparison **104** is made to determine whether the new central local node's connection to the service provider offers the more favorable rate based on the average length of communication that what was being offered through the previously considered central local node. If better, the newly considered central local node (and its associated service provider) is selected. If worse, the previously selected central local node (and its associated service provider) will remain selected.

This process is repeated **108** for each central local node and thereby each service provider. When done, the format of the call, the appropriate service provider, network and time of day are selected for sending the transmission to the selected central local node **110** and the billing information is updated **112**.

By selecting the appropriate network, it may be ascertained that it is less expensive to transmit the telecopier message in digital form over a data network than to transmit the telecopier message in voice callback format through the long distance carriers. Thus, the data network may be the network of choice for purposes of selecting the least cost between nodes. On the other hand, the central local node should give priority to the customer's preferences, which could mean that the transmission be routed through the most secure route which may not be the data network Instead, a secure transmission would be through a different routing and would result in an increase in transmission cost.

FIG. **6** shows a flow chart for establishing a synchronized connection of both call legs, that is, synchronizing the completion of callback and called party communications by selecting specific system time and speed of callback time. A user is allowed to stay on a line or hang up to wait for a callback while the routing unit time the completion of both communications from the routing unit to the calling party access number and the called party access number and ensures that both occur simultaneously or according to cost efficiency of transaction. The routing unit checks an internal data base to determine how long to wait before commencement of opening communications with both so as to ensure synchronization of the callback and called party calls. This may be based on the historical performance of placing the callback and called party calls or placing a data call or tracking down a party.

Appx39

US 7,724,879 B2

**11**

A routing unit initially receives the first leg **120** (location, city, destination) of the calling party and the second leg **122** (location, city, destination) of the called party and then looks up in a status call back table in memory **124** for the least estimated connection time. The difference **126** is calculated between the connection times of the two legs and the leg with the longer connection time needed is dialed **128**. A timer **130** is set to the difference and counts down to zero **132**.

When the counting down is completed, the timer triggers the actuation to open communication with the leg with the shorter connection time **134** to establish the call **136**. If a called party is to be called that is not found in the status call back table in memory **124**, then the actuation to open communication takes place in the sequence of the called party leg first and then the other leg. The average connection times are then stored in the table in memory **124** for future synchronization of the two legs. The table is continuously updated every time calls are placed. The average connection times for both legs and the service providers that are available for connection to the called party location and city codes are stored in the table for retrieval upon demand.

Another aspect of the invention concerns blocking the channels so no other incoming calls can interrupt during the time the routing unit performs the callback and called party calls. The intercept unit only releases the blocked channel a few seconds before the time specified in the history of completion of the callback and called party calls. Alternatively, the time delay may be based on a fixed minimum time period common for placing those types of calls. For instance, if a long distance call takes 10 to 15 seconds depending upon the called party, the time delay period that is set could always be 9 or 10 seconds under the time required to make that call. Thus, there is only a short time period during which an incoming call can interrupt the routing unit's synchronization of the completion of the callback and called party calls. It should be noted that the data base checked by the intercept unit may not be the same data base checked by the routing unit, although their contents could be the same. Such call blocking features are commercially available from VoiceSmart in software and hardware under the designation transparent local node (TLN) and hotel local node (HLN). By blocking such incoming calls, service providers no longer face the risk of bearing the expense of completing the second callback leg if the first callback leg becomes busy due to an incoming call.

FIGS. 7A-7G exemplify different techniques for efficient routing communications in accordance with the invention. Access devices **150** and **156** (FIGS. 7A-7G) and nodes **152** (FIGS. 7A-7C, 7E-7F), **154** (FIGS. 7A-7G) and **160** (FIG. 7C) on a network are shown, but each node may be located in the same or different geographical region or country. The access device **150** may have an intercept capability to render the ensuing routing connections transparent to the users. Node **158** (FIG. 7B) represents an access device on a different network. For purposes of example, links **170** (FIGS. 7A-7G) and **174** (FIGS. 7A-7G) may be considered voice transmission lines and links **172** (FIGS. 7A-7C, 7F) and **173** (FIG. 7D) may be considered data transmission lines. Link **176** (FIG. 7B) may be a paging or cellular line. Links **178** (FIGS. 7E and 7G) and **180** (FIG. 7E) may be data lines. Links **182**, **184** and **186** (FIG. 7F) may also be data lines. Each node may perform the function of terminating the call, such as when authorization is not forthcoming for carrying out the transaction.

FIG. 7A shows nodes **152** and **154** effecting communication with their respective access devices **150** and **156**, as would be done for simultaneous callback Initially, the initiator access device **150**, transmits its identification and that of the other access device **156** to node **152**. Node **152** requests

**12**

node **154** to make an inquiry on the availability of access device **156**. If available, then callback is made over respective links **170**, **174**, preferably for simultaneous communication. The two callbacks are bridged over link **172**. Nodes **152** and **154** convert voice transmissions into data transmission and vice versa so that data transmissions travel between nodes **152** and **154** and voice transmissions travel from the access devices to the associated nodes **152**, **154**. Links **170**, **172** and **174** may handle voice or data communications.

FIG. 7B works in the same way as in FIG. 7A, except that node **154** pages the called party via paging device **158** over paging network **176**. Once paged, the called party calls node **154** through access device **156** and communication is established by bridging over link **172**. During the interim between paging of the called party and the calling to the node **154** by the called party through the access device **154**, the access device **150** may either be waiting for communication to be established with node **152** or be called back by node **152** after node **152** is advised that the access device **156** has contacted the node **154**.

FIG. 7C is the same as that of FIG. 7A, except that an additional node **160** between nodes **152**, **154** is shown to illustrate that the routing between nodes **152**, **154** may not be direct, and also showing that access device **150** is communicating directly with node **152** rather than as a result of callback as in FIG. 7A and using two different data links **172** and **173**.

FIG. 7D shows that communication may be through a single node **154**, rather than through two nodes as in FIGS. 7A-7C as in case where access device **150** is a computer that has direct access to data link **172**

FIG. 7E shows also that communication may be through a single node **152**, rather than through two nodes, but also shows that such communication is established after access device **150** communications with node **154** say through E-mail that communication is desired with access device **156**. Instead of routing the transmission through node **154**, node **154** signals to node **152** to make contact with access devices **150** and **156** directly.

FIG. 7F shows a callback type of arrangement in which a request for establishing communication from access device **150** to access device **156** is made through one kind of network, but the actual callback is done over a different kind of network, although both kinds of networks share the same nodes **152**, **154**. As an example, the request could be through two voice links **170**, **174** from respective access devices **150**, **156**, with the two voice links being bridged by a data link **172**. The nodes **152**, **154** convert voice transmissions into data transmissions and vice versa as desired.

FIG. 7G is the same as FIG. 7E, except that node **154** also performs the function of node **152** in FIG. 7E and thereby routes the transmissions through itself. In this case, a request for establishing communication with access device **156** from access device **150** is effected over a data link **178**, such as through E-mail. In response, node **154** calls both access devices **150**, **156**, preferably so that each is contacted simultaneously, over a different network such as over voice lines **170**, **174**.

In each of these examples of FIGS. 7A-7G, billing is handled transparent to the parties using the access devices **150**, **156**. Each of the nodes are in contact with a central node (or network of central nodes) that must clear the transaction before the termination nodes take action through a global authorizer. Once the transaction cleared, an authorization code is provided to the node. The authorization code may

US 7,724,879 B2

**13**

either be forwarded to some other node at the time a request is made to establish communication or may be in response for such from that other node.

The central node, which includes the global authorizer, would check the total open credit or debit for the originating node, check for patterns of fraud, check for rights to terminate communication early based on available credit, and check the calling party credit standings with third parties. Based on the results of such checking, the global authorizer of the central node either approves or disapproves of the proposed transaction. Once the transaction is complete, the node responsible communicates such completion to the central node, which then updates account information accordingly. If a node is being shut down, the central node also communicates such shutdown to all other nodes so that they remove the shutdown node from the stored routing table of available nodes.

FIG. **8** shows a central local node A interacting with a calling party access device interface and a global network of high capacity data networks. Access devices may communicate with central local nodes directly or through intercept devices which direct the communication to the central local node. Access devices are exemplified by telephones, pagers, cellular phones, laptops, facsimile machines, multimedia computer workstations, etc.

The subscriber access device interface includes communication networks such as digital and analog telephone, paging and cellular, and data. The central local node includes an authorizer, converters for each communication network, a main processor and router, a main data base, compression and coding system and decompressing and decoding system. The global networks of high capacity data networks include the internet, frame relay and digital and analog voice lines.

The authorizer is responsible for providing clearing transactions to provide authorization for making communication. The authorizer checks with a main data base within the central local node to determine whether the subscriber's credit is good and to what extent to ensure that service providers get paid. The data base may contain a history of the subscriber's usage and outstanding unpaid balance and other information relating to credit history. The main data base's information may be updated from information in other nodal data bases and vice versa, including that of the central node, which should contain the most current information and whose global authorizer may be responsible for authorizing all transactions in advance. By the same process, the global authorizer can check on the creditworthiness of service providers if the service providers will be responsible for paying each other.

The converters convert the form of the communication to suit the particular network over which the communication will be routed, e.g., voice into data, etc. The main processor and router is responsible for checking with the main data base to determine which service providers and communication networks to utilize and to access circuitry to compress or decompress the communications as needed and to access circuitry to code or decode the communications for security purposes.

The main processor and router route the communications through appropriate converters if necessary to suit the network being utilized for routing, i.e., internet, frame relay and ATM, or digital and analog voice lines. The main processor and router also direct the communication to the ultimate destination, i.e., access devices of the called party. In so doing, other central local nodes B or C may be used for part of the routing or else route directly to the access devices via the associated intercept if any for the access device. These intercept devices are also for directing communications

**14**

Converters are available conventionally, such as Texas Instrument digital signal processors which convert voice to data and vice versa. Intercepts are available from VoiceSmart by ordering TLN or HLN and are available conventional from phone companies. The intercept may be part of or separate from the access devices. The intercept evaluates whether savings may be achieved by routing to a node and, if so, routes the transmission to the central local node A of FIG. **8** and identifies the subscriber and called party or service type.

The node receiving the routing from the intercept polls other nodes to trace the called party number or identification address. In this manner, the main processor and router of the node serves as an interrogator that interrogates the availability of the called party number or identification address. The node accesses a main data bank to check the communication network, call format and user preferences to determine the best connection between locations **150** and **156** of FIGS. **7**A-**7**G. The node, through its authorizer, checks whether completing the routing of the transmission is authorized and obtains an authorization code from the global authorizer at the central node. The node converts the transmission if necessary for compatibility and records billing information to ensure proper end user billing. Also, the node updates user statistical usage and access for future use. Each of these tasks that are performed by the node are carried out in a manner that is transparent to the calling party.

FIG. **9** is a variation of that of FIG. **1**, but shares the same components that are identified by the same reference numerals. Additional two-way direct link connections **46**A, **46**B, **46**C, **46**D) and **46**E are included. For instance, one route for sending a request as to availability may be from the calling party access device **12** to the local access node **18** either directly or through the intercept **16** and then directly to either the communications network **10**, the data network **20** or another network **200** such as a cellular network, ATM, and/or frame relay. The central switching unit **22** then receives the request from the network as to availability to check on the availability of the called party access device **14**. Once the availability becomes known, an appropriate signal may be sent directly back to the central local node **18** either backtracking through the same route or through the second central local node **24** to either the communications network **10** or the data network **20** to thereafter reach the local access node **18**, Note that the second central local node **24** may be considered a local access node for the called party access device **14**.

A central local node global authorizer **220** is shown to which permission must be obtained by confirming authorization requests before routing connections between the calling and called parties may take place. This global authorizer **220** may be part of the central node to which all the central local nodes are in communication. In FIG. **8**, for instance, the connection from the main data base to the other node data bases would include connection with the central node and thereby with this global authorizer. Authorization requests would be sent to the global authorizer **220** via the applicable one or more of the networks **10**, **20**, **200**.

All the routing paths of FIGS. **7**A to **7**G are applicable to the block diagram of FIG. **9**. Also, the representation of the interaction of the central local node with various networks as shown in FIG. **8** is applicable to FIGS. **1** and **9**.

FIG. **9** shows some links as bi-directional lines and others as two single-directional lines in opposite directions. This was done for convenience and is in no way intended to be limited to one form or the other. Routes may be through any path available, except that the routing through links **53**A, **53**B and **53**C only arises if calling location **48** communicates in a

US 7,724,879 B2

15

manner compatible with the applicable one of the networks **10**, **20** or **200**. Otherwise, routing will have to be done through the central local node **18**.

If the calling party location uses a laptop computer and thus connects directly with the data network **20** and bypasses the central local node, the path of communication would still pass through either the central office **22** or the central local node **24** before reaching the called party access device **14**. At the central office **22** or the central local node **24**, therefore, the applicable billing information may be recorded.

While intercept **16** and central local node **18** are shown as separate units, they may be combined together. Similarly, while the central office **22** and central local node **24** are shown as separate units, they may be combined together. By being combined together, a unitary device would provide the functions of both.

While the foregoing description and drawings represent the preferred embodiments of the present invention, it will be understood that various changes and modifications may be made without departing from the spirit and scope of the present invention.

Thus, while there have shown and described and pointed out fundamental novel features of the invention as applied to a preferred embodiment thereof, it will be understood that various omissions and substitutions and changes in the form and details of the devices illustrated, and in their operation, may be made by those skilled in the art without departing from the spirit of the invention. For example, it is expressly intended that all combinations of those elements and/or method steps which perform substantially the same function in substantially the same way to achieve the same results are within the scope of the invention. Moreover, it should be recognized that structures and/or elements and/or method steps shown and/or described in connection with any disclosed form or embodiment of the invention may be incorporated in any other disclosed or described or suggested form or embodiment as a general matter of design choice. It is the intention, therefore, to be limited only as indicated by the scope of the claims appended hereto.

What is claimed is:

**1**. A method for communication between two access devices via one or more networks, comprising the steps:
  receiving a transmission in a first format through a first communication network from a first access device, the first format comprising a telecommunication protocol for establishing and transmitting voice communication for a phone call in one of a digital telephone network, an analog telephone network, and a cellular network;
  performing a first conversion converting the transmission from the first format to a second format, the second format being an internet protocol;

16

  sending the converted transmission through a second communication network, the second communication network being a data network, for reception by a second access device; and
  performing a second conversion further converting the converted transmission from the second format to a further format suitable for the second access device, wherein the first access device and the second access device comprise telecommunication nodes, and said further format comprises said first format or another telecommunication protocol.

**2**. The method of claim **1**, wherein the transmission is sent from the first access device serially to a first central node, the data network, a second central node, and the second access device.

**3**. The method of claim **1**, wherein the transmission is related to establishing or transmitting voice communication for a phone call from a calling party connected to the first access device to a called party connected to the second access device.

**4**. The method of claim **1**, wherein the first communication network is one of an analog telephone network, a digital telephone network, and a cellular network.

**5**. The method of claim **1**, wherein a calling party is connected to the first access device for transmitting and receiving voice communication for a phone call and a called party is connected to the second access device for transmitting and receiving the voice communication for the phone call.

**6**. The method of claim **1**, wherein the second conversion is performed at the second access device.

**7**. The method of claim **1**, wherein said second access device is connected to a central office of a telecommunication network.

**8**. The method of claim **1**, further comprising the step of selecting a route for the transmission based on at least one criteria defined by user preference.

**9**. The method of claim **8**, wherein the at least one criteria comprises a specified level of transmission quality.

**10**. The method of claim **8**, wherein the at least one criteria comprises credit availability of a calling party.

**11**. The method of claim **8**, wherein the at least one criteria comprises cost of routing.

**12**. The method of claim **8**, wherein the transmission comprises execution of a call setup procedure.

**13**. The method of claim **1**, further comprising the step of storing at least one of subscriber information, rate schedules, and call details.

**14**. The method of claim **1**, wherein the transmission is related to a fax transmission.

**15**. The method of claim **1**, wherein the transmission comprises signaling messages.

\*    \*    \*    \*    \*